Filed 12/5/16

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSEPH BURROUGHS,<br><br>    Defendant and Appellant. | B267353<br><br>(Los Angeles County<br>Super. Ct. No. ZM014605) |


    APPEAL from a judgment of the Superior Court of Los Angeles County, Drew E. Edwards, Judge. Reversed.

    Rudy G. Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

    Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Joseph Burroughs appeals from a jury verdict adjudicating him a sexually violent predator (SVP) under the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.),[1] and ordering his indeterminate commitment to Coalinga State Hospital. He argues the trial court should have assessed his mental competency before allowing him to proceed to trial. He also contends the trial court committed prejudicial evidentiary errors by allowing expert witnesses to testify to matters beyond their expertise, by allowing those same witnesses to testify about otherwise inadmissible hearsay, and by admitting into evidence inadmissible documents and portions of documents.

Although we reject appellant's competency claim, we agree with many of his evidentiary arguments. In *People v. Sanchez* (2016) 63 Cal.4th 665, 686 (*Sanchez*), the California Supreme Court held that an expert witness cannot in conformity with the Evidence Code "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." The People's experts did just that, relying on inadmissible hearsay to support extensive testimony about appellant's unrelated convictions and unproven allegations that he committed other acts of sexual violence. This inflammatory documentary and testimonial hearsay was prejudicial even under *People v. Watson* (1956) 46 Cal.2d 818, 836. We accordingly reverse the judgment and remand for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

On May 12, 2009, the Los Angeles County District Attorney ("the People") filed a petition pursuant to section 6601 to commit

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

appellant as an SVP. An SVP is "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) Under the SVPA, the People may seek to confine and treat SVPs "until their dangerous disorders recede and they no longer pose a societal threat." (*Moore v. Superior Court* (2010) 50 Cal.4th 802, 815 (*Moore*).) The special proceedings that ensue after the People file such a petition are civil in nature, but an SVP defendant is afforded many of the same procedural protections afforded criminal defendants, such as the right to court-appointed counsel and experts, the right to a unanimous jury verdict, the right to testify in one's defense, and the right to have the People prove his or her SVP status beyond a reasonable doubt. (See *id.* at pp. 816-817; *People v. Allen* (2008) 44 Cal.4th 843, 861, 870.)

The trial court reviewed the People's petition in accordance with section 6601.5 and ordered a probable cause hearing pursuant to section 6602. After appellant waived his rights to appear and cross-examine witnesses at a probable cause hearing, the trial court held him to answer to the petition. A series of stipulated continuances ensued.

On January 10, 2014, appellant's counsel filed a motion to stay the proceedings and order "competency training" for appellant, noting that appellant "has chosen to refuse to talk to counsel." The People opposed the motion. The trial court denied the motion on March 27, 2014. The trial court also granted the People's later motion in limine to exclude testimony regarding appellant's alleged incompetency from the trial.

3

After several more continuances, appellant proceeded to jury trial on August 21, 2015.  As discussed more extensively below, appellant filed—and the trial court denied—motions in limine to exclude references to uncharged and unrelated crimes, expert testimony regarding the contents of documents considered in formulating their opinions, and expert testimony based on unreliable information or outside the experts' expertise.  The jury returned its verdict on September 3, 2015, finding true the allegation that appellant was a sexually violent predator within the meaning of the SVPA.  The trial court ordered him committed to Coalinga State Hospital for an indeterminate term.  Appellant timely filed a notice of appeal.

## FACTUAL BACKGROUND

### I.  The People's Evidence

### A.  Dr. Nancy Webber

Dr. Nancy Webber, Ph.D. is a clinical forensic psychologist who contracts with the state to provide SVP evaluations.  She was contracted to evaluate appellant in 2009 and later prepared updated evaluations.  Because appellant refused to meet with her, she had to rely upon documentary evidence to assess whether he satisfied the statutory criteria to be deemed an SVP.  That evidence included probation reports, police reports, appellant's mental health history, and behavior reports from the institutions in which appellant has been housed.

#### 1.  Convictions for sexually violent offenses

Webber opined that appellant met all three statutory elements to be classified as an SVP.[2]  First, he was convicted of

_____

[2] Those criteria are:  "(1) conviction of a 'sexually violent offense'; (2) a diagnosed mental disorder that makes a person a danger to the health and safety of others; and (3) the mental

4

committing a sexually violent offense against one or more persons. Webber testified that appellant actually had two such convictions or "qualifying offenses": a conviction for lewd and lascivious acts with a child under the age of 14, 13-year-old Liza B., and a conviction for the attempted rape of 19-year-old Tanya G. Webber reviewed the police reports and probation reports associated with these offenses. Certified copies of those documents were admitted into evidence.

Webber testified to the following details of the qualifying offenses. The first happened in 1994, while appellant was on parole. Appellant was dating 13-year-old Liza's mother. Liza's mother fell asleep while she, Liza, and appellant were watching television. Appellant started kissing Liza's neck and fondling her breasts over her clothing. Liza told him to stop and went into the bathroom. Appellant forced his way into the bathroom and began kissing Liza again. He also removed her blouse and undershirt. Liza sobbed as appellant kissed and licked her bare breasts. He told her to shut up. He then choked her with both of his hands and put her in a strangle hold. He threatened to tie her up with a bath towel if she did not stop crying. He also threatened to kill her mother if she did not give him what he wanted. Appellant then pulled down Liza's pants, pulled down his own pants, and rubbed his erect penis over her legs and genital area.

---

disorder makes it likely the defendant will engage in 'sexually violent criminal behavior.' [Citation.]" (*People v. White* (2016) 3 Cal.App.5th 433, 448; see also § 6600, subd. (a)(1).) The second and third elements require a link between a currently diagnosed mental disorder characterized by the inability to control dangerous sexual behavior and a finding of future dangerousness. (*People v. White, supra*, 3 Cal.App.5th at p. 448.)

Around this time, Liza's mother knocked on the door and asked what was going on. Appellant pulled up his pants, opened the door, said he was using the bathroom, and closed the door. While appellant was distracted, Liza had pulled up her pants. Appellant pulled them down again, pulled his own pants down, and resumed the assault. Liza's mother knocked on the door again. When appellant did not respond, she opened the door. She saw Liza, grabbed her clothes, and fled the house with her. Liza's mother called police from a pay phone. When appellant was apprehended, he denied the incident. He claimed that Liza fabricated the incident because she did not like him and because her mother put her up to it. He further explained, "If I wanted to fuck someone, I'll fuck the mother." Appellant nonetheless was convicted of the crime, which Webber opined was "sexually violent" due to Liza's age and appellant's use of force against her. To Webber's knowledge, appellant did not show empathy toward Liza or otherwise accept responsibility for his actions.

The second qualifying offense occurred in 1996. Appellant was on the front porch of Tanya's house with her neighbor, Bob, who was his friend. Tanya went into the house after speaking with appellant and Bob. Appellant knocked on the door and asked if he could use the bathroom. Tanya let him into the house. He then grabbed Tanya from behind and said, "What do I need to do to get you?" Tanya initially thought appellant was joking. After he reiterated his desire for her, however, Tanya told him he could not have her because she had a boyfriend. Appellant responded by throwing Tanya onto a bed, getting on top of her, and telling her that he wanted her. He held Tanya down and tore off her blouse, covering her mouth to muffle her screams. Tanya fought appellant's advances, swinging her arms and

6

kicking him in the groin several times as he unzipped his pants. After appellant hit her in the mouth with a closed fist, Tanya managed to strike him in the head, push him off her, and run down the hallway. Appellant grabbed her and pulled her back into the bedroom, hitting her in the face with his fist. Tanya told appellant she would do whatever he wanted, prompting him to unzip his pants again. Tanya screamed and kicked and struck appellant. She escaped from the bedroom a second time and ran across the street to a neighbor's house to call the police.

Appellant fled the scene but was apprehended a short time later. He denied attempting to rape Tanya. He told police that he was drunk and went into the wrong house. Later, appellant admitted that he slapped Tanya; he claimed he was angry with her because she blew smoke in his face while they were using drugs together. Webber testified that appellant was convicted of attempted rape. She opined that the crime involved sexual violence, force, duress, and fear.

### 2. Mental disorder

Based on her review of the documents, Webber concluded that appellant met the second SVP criterion: he had a mental disorder, anti-social personality disorder (ASPD), that predisposed him to commit sexually violent offenses. Webber explained that the hallmark of ASPD is "a pervasive disregard for societal rules and some other behaviors." To be diagnosed with ASPD, a person must exhibit at least three of seven diagnostic criteria and demonstrate symptoms of a conduct disorder before the age of 15. Webber opined that appellant met all seven diagnostic criteria for ASPD. Webber also testified that appellant's history of arrests dating back to age 14 showed that his symptoms began prior to age 15.

7

Webber testified about the details underlying appellant's juvenile history, which she gleaned from the probation report prepared after appellant's 1994 offense against Liza. She told the jury that, at age 14, appellant participated in a group fight outside a movie theater. Police arrived and began handcuffing fight participants. Appellant used a knife to cut one of the handcuffed participants, which led police to arrest him. Webber testified that appellant was arrested for additional offenses in his youth, including "driving without a license, joyriding type arrests, being in a stolen vehicle." She further testified that "it was reported he was a gang member, the Rollin' 60s Crips affiliated gang in his juvenile years as well." The information about appellant's gang affiliation "was stamped on one of the police reports," and "has been reported while he was in prison."

Webber took all of these incidents into consideration when forming her ASPD diagnosis. She also took into account two alleged sex offenses for which appellant was arrested as a teenager. Webber testified that the first of those occurred when appellant was 15 or 16. He allegedly molested a six-year-old boy four or five times. According to Webber, appellant sodomized the boy on a school playground and gave him quarters after each encounter. Webber noted that "[w]e don't know whether that occurred or not," as appellant was never convicted of the offense. Webber noted that "[t]here is some concerns there [*sic*] he associated with it," and that the 1994 probation report included a statement by appellant that he knew the boy's mother, who sold marijuana and cocaine. Additionally, while appellant was incarcerated in 2003, he complained to prison officials that he was concerned about other inmates getting access to his paperwork "because his offenses involve the rape of police

8

families, families and rape of kids."

Webber testified that the second alleged sex offense appellant committed as a juvenile occurred in 1986. During that incident, Webber testified, a 21-year-old woman reported to police that appellant hit her over the head with a beer bottle after she refused his request for sexual favors. According to Webber, appellant admitted to hitting the woman on the head but claimed he did so because he was angry about getting his penis caught in his pants zipper while resisting her sexual advances against him.

Webber testified that appellant was also alleged to have committed several sex offenses as an adult. In 1988, another 21-year-old woman filed a police report against "Leo Boykins," which Webber testified was listed as an alias on appellant's rap sheet and appeared on a police report from 1991 "when he was arrested under Joseph Burroughs." According to Webber, the woman was walking down the street when appellant and his girlfriend at the time, Maria, drove by. The woman got in their car, and appellant and Maria drove her to appellant's apartment. Once inside the apartment, appellant hit the woman with the handle of a knife and told her to undress. When she refused to undress and further refused to orally copulate Maria, he kicked her to the ground and stomped her with his feet. After the woman undressed, appellant inserted the handle of the knife into her vagina and forced her to orally copulate him. He also had sexual intercourse with her three times over the next 12 hours. Before he let the woman go, appellant threatened to kill her baby if she went to the police. She went to the police anyway. The police later obtained Maria's statement, which was partially consistent with the woman's. According to Webber, Maria told the police that appellant hit the woman so hard Maria "could almost feel it

9

herself" and had sex with the woman as "payback for cocaine."

Webber also testified about an incident that occurred in 1991. On that occasion, appellant drove by a 36-year-old woman who was walking to the liquor store. The woman was acquainted with appellant and accepted his offer of a ride. Instead of taking the woman to the liquor store, however, he drove her to a camper. There, appellant offered the woman cocaine and drank alcohol with her. He then removed her clothes, forced her into bed, and attempted to sodomize her. When his efforts proved unsuccessful, he gave her the "option" to orally copulate him. He then had sex with her three times and punched her in the head before allowing her to leave the camper. The woman flagged down police and reported the incident. She refused treatment, however, and also refused to prosecute. Appellant denied the incident.

Webber also testified that appellant was arrested for a non-sexual assault in 1995. According to Webber, a woman who was either dating or engaged to appellant reported to police that appellant accosted her when she tried to break up with him and refused to give him back jewelry he had purchased for her. Appellant struggled with her and pulled a ring and bracelets off her. He also hit her in the head with a glass candle holder.

Webber testified that appellant was not convicted of any crimes in connection with most of these incidents; "[t]here were police reports but no convictions." Webber testified that SVP evaluators ordinarily take such incidents into account and confirmed that she did so when evaluating appellant. She explained, "[t]hey weren't verified via conviction, but I do look at the content in case there is some patterns [*sic*] that might be suggested that this truly occurred, as well as in this particular

10

case is unique. There is some admission of an aspect of it. Like, yes, I hit the 21-year-old girl with a beer bottle because I was mad at her. He admitted that." Appellant's counsel objected "as hearsay not offered for the truth of the matter," but the trial court overruled the objection on the ground that the evidence was being offered as "the basis of the doctor's opinion."

Webber opined that all of these incidents supported her diagnosis of ASPD. The arrests and convictions demonstrated appellant's inability to conform to social norms, as well as his impulsivity, aggressiveness, and disregard for the safety of others. Webber further opined that appellant's deceit in using an alias ("Leo Boykins") and lack of remorse for his victims supported the diagnosis. Webber concluded that appellant's ASPD impaired his emotional and volitional capacity because he was not deterred by "the suffering of his victims," the presence of others during the commission of the offense, or the punishments he received for some of the offenses.

Webber testified that her diagnosis and conclusions also were supported by appellant's conduct in prison and the state hospital. While incarcerated from 1998-2009, appellant incurred 18 serious rule violations. Webber testified that "about four of them was [sic] for lethal combat," several were related to appellant's refusal to have a cell mate, and "[o]thers were for delaying police officers." Webber also noted that appellant refused to sign his conditions for parole. While confined at Coalinga State Hospital from 2009-2015, she testified, appellant engaged in "episodes where he flares up, gets verbally aggressive with the staff." Webber stated that the frequency of such incidents increased over the years. She attributed them to her secondary diagnosis of appellant, "[u]nspecified schizophrenic

11

spectrum and other psychiatric disorders."

Webber provided more detail about appellant's behavior at the state hospital. She testified that he refused to participate in group therapy, acted aggressively with staff when he was denied yard time, called a staff member a "stupid bitch," and threatened to "lay hands on somebody if that is what it takes" after he was found to have tampered with an electrical outlet. In 2015, hospital staff observed him "grimacing, making jerky motions, making unusual motions . . . . [t]aking his hand and rubbing over a clenched fist of the other" while listening to music or watching a movie on his personal device. Appellant became angry when staff asked if he was okay. On other occasions, appellant referred to himself as "Jesus Christ," "a holy child," and "the booby," which he told staff meant that he was the devil or Satan. Webber testified that appellant refused contact with anyone outside the hospital, including her and his attorney, and "would stay holed [up in] his cell for long periods of time without going out in the yard, showering or things like that." Webber opined these behaviors supported a secondary diagnosis of delusions or paranoia. Webber further testified that appellant displayed "pictures of adult females in his room," and noted that a "relief shift lead who works nights says she had seen him watching a lot of pornography on his DVD player at nighttime," which to Webber demonstrated that "there is some sexual interests occurring still and possible sexual preoccupation." Webber noted, however, that other hospital staff members she spoke to "have not observed any sexual behaviors."

Webber explained that she rested her conclusion that appellant was an SVP on her diagnosis of ASPD, not upon her secondary diagnoses of unspecified psychiatric and/or

12

schizophrenic spectrum disorders. Thus, her opinion was "that his anti-social personality disorder predisposes him to commit sexually violent offenses." The secondary diagnosis was relevant "because it exacerbates and worsens his A.S.P.D." Webber testified that if appellant had problems accurately perceiving reality, "it raises questions of is he misperceiving interactions with people in the community that could facilitate sexual offending." Webber noted that it was unusual for her to find someone who qualified as an SVP based on a diagnosis of ASPD; she estimated she had seen only four or five other cases while conducting over 500 SVP evaluations. Webber believed this unusual conclusion was appropriate in appellant's case because there was a "sexual component" to his deviant behavior. She explained, "[t]he majority of his arrests have involved a sex-related component." Webber further opined that appellant's condition was worsening, because there had been "more incidents of his unusual behaviors, or being easily irritable or flaring up over something." She also was concerned about appellant's refusal to participate in any sort of therapeutic activities or treatment, and his apparent lack of insight into his sexual problems.

### 3. Likelihood of future sexual offenses

Webber opined that appellant also met the third criterion to be diagnosed as an SVP: he was "likely to engage in sexually violent predatory criminal behavior as a result of the diagnosed mental disorder." To reach this conclusion, Webber used two actuarial instruments, the Static-99R and the Static-2002R, to evaluate appellant. Both instruments assign a score, then use rates and percentiles associated with that score to provide information about the risk that the subject will commit a sex

13

offense in the future. Webber testified that appellant had a score of seven on the Static-99R; that score reflected the offenses of which he was not convicted as well as a point for the male child he allegedly sodomized. Appellant's score placed him in the high-risk category for reoffending. Appellant scored eight points on the Static-2002R, which Webber testified also reflected uncharged conduct and "was in the ballpark" of his Static-99R score. Under the Static-2002R, however, a score of eight reflected a moderate-high risk of reoffending. None of the "protective factors" Webber considered lowered appellant's risk of reoffense. Webber opined that appellant's future sex crimes were likely to be predatory, or to involve a stranger or casual acquaintance, because he had a history of committing such offenses and did not have a treatment plan.

### B. Dr. Christopher North

Dr. Christopher North, Ph.D. is a licensed psychologist who performs SVP evaluations for the states of California and Washington and the U.S. Department of Justice. He was asked to evaluate appellant in 2009. Appellant refused to participate in an interview, however, so North, like Webber, relied primarily on documentary evidence to assess him. North assessed appellant in 2009, 2013, 2014, and 2015. North reviewed police reports, probation reports, prison records, violation reports, and various other documents "to get as complete a picture of the inmate as possible." From his review, North concluded that appellant met all three criteria to be classified as an SVP.

#### 1. Convictions for sexually violent offenses

North testified that he based his conclusion about the first criterion, conviction of a sexually violent offense, on appellant's criminal history transcript and an abstract of judgment. When

14

North began testifying as to the details of appellant's conviction involving Liza, appellant's counsel objected under Evidence Code section 352. The trial court overruled her objection and advised the jury that "the doctor's testimony about what happened is simply offered [as] the basis for his opinion." North continued testifying about the details of the offense. His narrative was shorter and less richly detailed than Webber's, but related the same factual underpinnings to which she testified. North opined that the offenses against Liza and Tanya were sexually violent; appellant choked, hit, and threatened to kill Liza, and hit and violently struggled with Tanya.

### 2. Mental disorder

North opined that appellant met the second SVP criterion, having a diagnosed mental disorder that predisposes him to commit criminal sexual acts. Like Webber, he diagnosed appellant with ASPD. Based on his interviews with Coalinga State Hospital staff and his review of appellant's hospital records, North also concluded that there was "some evidence of psychiatric disorder." North testified that "there were numerous incidents of him behaving bizarrely," such as "grimacing," "dancing," "talking to himself," and generally acting as though he was "off in his own little world." North also testified that some entries in appellant's hospital chart indicated that he was "responding to internal stimuli," such as voices in his head.

North explained that appellant's ASPD had "paranoid features." North testified that appellant "is fearful of other people," "doesn't interact well with people," "doesn't like any kind of supervision at all," and generally "can't stand to be around people." North also opined that appellant's ASPD impaired his emotional and volitional control. North based that conclusion on

15

appellant's criminal history, including the juvenile and uncharged offenses about which he, like Webber, provided details. North explained that he got the details relating to the juvenile and uncharged offenses from probation reports and police reports, which he "generally assume[s] . . . are reliable unless I have other information to the contrary." Taken as a whole, North opined, appellant's criminal history demonstrated evidence of all seven ASPD diagnostic criteria. North also noted that "approximately half of his crimes and most serious crimes have been sex crimes." North "assume[d]" from this information that appellant "is a guy who has a fairly high sex drive and takes what he wants sexually from others." North opined that appellant "acts on impulse and he takes what he wants," demonstrating lack of volitional control, and has a deficit in emotional capacity because he demonstrated "an inability to empathize or feel the harm or understand the harm he is doing to his victims by assaulting them and raping them."

North clarified that he did not "have the evidence" to diagnose appellant as hypersexual. However, he opined that appellant's ASPD predisposed him to commit sexual crimes because "[m]any or most of his crimes have been sexual in nature." North acknowledged that many criminals have ASPD, but opined that appellant was set apart because "there is no robbery or other motive involved in any of the sex crimes. It is simply sexual. He is assaulting these people because he wanted to take sex from them." North further testified that his own views on ASPD had evolved since he began doing SVP evaluations. Initially, he felt ASPD alone was not sufficient to qualify someone as an SVP. Over time, however, as he evaluated more people with ASPD, he came to believe that an ASPD

16

diagnosis could support a conclusion of SVP if the person lacked a paraphilia[3] but nonetheless had a high sex drive and took what he or she wanted sexually. North stated that there had been a "trend of change in opinion" toward this view, but it was not yet "universally accepted."

North testified that there was some evidence that appellant's ASPD had manifested itself while he was in prison and the state hospital, even though he had not acted out sexually at either place. According to North, appellant behaved in bizarre ways and "became very irritable" when staff asked him if he was okay. "If that is his response to someone who is showing some kind of concern about him, I can only imagine how he would respond if the person were more directly threatening to him."

### 3. Likelihood of future sexual offenses

North opined that appellant was likely to commit sex offenses in the future. He noted that appellant "has attempted to rape or raped within literally within [*sic*] a couple months of his getting out," and opining that appellant was more likely to succumb to the impulsivity of his ASPD and commit sex crimes when outside a closely controlled hospital setting. North testified that this opinion was supported by the results of the Static-99R and the Static-2002R. North initially assigned appellant a score of eight to nine on the Static-99R, but later revised it to a seven or eight. The uncertainty in the numbers came from North's inability to ascertain from appellant's records whether he had

---

[3] "'The term *paraphilia* denotes any intense and persistent sexual interest other than sexual interest in genital stimulation or preparatory fondling with phenotypically normal, physically mature, consenting human partners.' (DSM-V, p. 685.)" (Couzens & Bigelow, Cal. Law and Procedure: Sex Crimes (The Rutter Group 2015) § 14:2, p. 14-10.)

17

lived with a romantic partner for two years or more. If he had, his score would be a seven. If not, North would give him an eight. North testified that either score would place appellant in the high-risk category. North opined that appellant would be toward the higher end of the risk range, because "[h]is sex offenses were pretty brutal. There is a lot of violence involved in them. The fact that he reoffended so quickly after being released from custody, just the sheer number of offences [*sic*]." North gave appellant a score of eight on the Static-2002R, which placed him in the moderate-high risk category. Like Webber, he opined that appellant's scores on the Static tests were consistent with one another and with a likelihood of reoffending.

North's conclusions about appellant's likelihood of reoffending did not change when he considered potential "protective factors" that could lessen the risk appellant posed, such as appellant's age, health, and completion (or not) of treatment. North further opined that appellant's future sex crimes were likely to be predatory, because his last victim, Tanya, was a stranger. North also opined that appellant was not amenable to treatment for his ASPD, which was likely to become more active once he encountered the stresses of living outside the hospital. Based on the repeated mentions of cocaine in appellant's criminal records, North thought appellant might have a cocaine problem that would further increase "volatility" if appellant were released.

### C.    Documentary Evidence

Prior to trial, appellant moved in limine to exclude all evidence of uncharged offenses. The details of his uncharged offenses were included in probation reports pertaining to the

18

offenses of which he was convicted.  Appellant conceded that the probation reports were admissible to prove the details underlying the convictions used to support the petition under section 6600, subdivision (a)(3) (qualifying offenses),[4] but argued that "[t]he statute does not create a vehicle for hearsay reference to all bad acts [appellant] has committed.  There is no bases [*sic*] to include acts such as dismissed, uncharged or non-qualifying offenses." Appellant reiterated this argument when the motion was heard, arguing that "[i]t is one thing to say it is not hearsay for the qualifying charges," but "[e]verything else is hearsay," such that "[t]hey can testify to the basis but not the facts.  Certainly not on direct."  He also argued that evidence of his uncharged crimes was unduly prejudicial under Evidence Code section 352.

The trial court denied the motion in limine on the ground that the documents were admissible for the non-hearsay purpose

---

[4] Section 6600, subdivision (a)(3) states:  "Conviction of one or more of the crimes enumerated in this section shall constitute evidence that may support a court or jury determination that a person is a sexually violent predator, but shall not be the sole basis for the determination.  The existence of any prior convictions may be shown with documentary evidence.  The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals.  Jurors shall be admonished that they may not find a person a sexually violent predator based on prior offenses absent relevant evidence of a currently diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

19

of explaining the basis of the experts' opinions. The court also denied appellant's request that the experts be prevented from testifying to the details of his uncharged offenses for the same reason. The trial court further ruled that the probative value of such evidence outweighed the potential prejudice to appellant.

At the close of its case, the prosecution moved to admit all but one of its exhibits into evidence. Appellant raised no objections to Exhibit 1, Webber's curriculum vitae, or Exhibit 2, which the court described as a "969.B packet."[5] Appellant objected to the admission of Exhibit 3, the charging document for the Tanya case, on foundation grounds. He also objected to "any and all police reports and probation reports"—Exhibits 4, 4A, 5, 5A, 8, 8A, 9, and 9A, the "As" being the redacted versions of the documents—"as being historically the worst kind of hearsay that is not ever introduced into evidence." He argued that "[n]o one was brought in who has personal knowledge about the making of this police report, and there is [*sic*] hundreds of pieces of information on this report that were not testified to." The prosecution argued that the documents were admissible under Welfare and Institutions Code, section 6600, subdivision (a)(3)

---

[5] Penal Code section 969b authorizes the People to prove the existence of prior convictions in a criminal case by introducing certified copies of prison records. (See Pen. Code, § 969b.) The People may use such records for the same purpose in SVP cases. (See *People v. Dean* (2009) 174 Cal.App.4th 186, 196 (*Dean*); *People v. McGee* (2006) 38 Cal.4th 682, 702, fn. 8.) The packet in this case contained the abstracts of judgment for appellant's convictions involving Liza, Tanya, and his girlfriend or fiancée. It also contained appellant's fingerprints, mug shot, and "chronological history" of his custodial placements.

20

and case law interpreting that section.  The trial court ultimately agreed with the prosecution and admitted all of the challenged exhibits in their entirety.  The court also admitted Exhibit 11, a Department of Justice document linking appellant to the alias "Leo Boykins," and Exhibit 12, North's curriculum vitae.

## II.    Defense Evidence

### A.    Dr. Hy Malinek

Defendant called as his witness Dr. Hy Malinek, Psy.D., a clinical and forensic psychologist.  He saw appellant four times— once during a video conference in 2009, twice in person that same year, and once in person a week before trial.  Malinek also reviewed appellant's mental health records and police reports and other records documenting his past crimes.  Malinek testified that although he considered the police and probation reports, he did not give any weight to charges or allegations that were dismissed or did not result in convictions.  In Malinek's view, it "would be improper and unethical" to consider unproven charges as fact.  He testified that he assumed the district attorney investigated the allegations and had a reason to dismiss or reject them, which in turn caused him to wonder about the reliability of such charges.  Malinek considered appellant's convictions for the crimes against Liza and Tanya.  He concluded from those that appellant satisfied the first SVP criterion, conviction of a sexually violent offense.

Malinek opined that appellant did not satisfy the second SVP criterion, having a diagnosed mental disorder that predisposes him to commit criminal sexual acts.  Malinek agreed with the other experts that appellant had a diagnosable mental disorder. Malinek testified that appellant had a "prominent personality disorder with paranoid elements," and "clearly" met

21

the diagnostic criteria for ASPD.  Malinek further testified that appellant was "an unusual man to diagnose," because "he has intermittently shown many indications of psychiatric symptoms," such as delusional statements, suicide attempts, and isolative behaviors.  He also had a history of suffering trauma, including being diagnosed with and treated for leukemia at age eight, being beaten in the head by his grandmother, and injuring his head in an accident.

Malinek opined that none of these issues predisposed appellant to commit sexual offenses, however.  He stated that there was "nothing in the literature of antisocial personality disorder or in the diagnostic manual that discusses a predisposition to sexual offenses," and further testified that there was no link between appellant's "delusional preoccupation" and sexual offenses, "[h]im being a child of God on the one hand and sexual offenses on the other."  Likewise, Malinek testified that appellant's potential abuses of drugs or alcohol "do not predispose someone to commit sexual offenses, but a wide variety of acting out."  Malinek found it very important that appellant never acted out sexually during the 19 years he had been confined.  Thus, even though Malinek conceded that appellant was "a violent and a dangerous man," he did not believe appellant's mental illnesses predisposed him to commit sex offenses in particular.

According to Malinek, Webber's diagnosis of an unspecified psychiatric disorder would not predispose appellant to commit sexual offenses.  Neither would Webber's diagnosis of unspecified schizophrenia spectrum disorder; in Malinek's opinion, nothing in atypical schizophrenia would predispose a patient to commit sex offenses unless his or her delusions were sexual in nature.  Malinek opined that appellant's past crimes were not motivated

22

by such delusions but rather were crimes "of opportunity, violence, alcohol facilitated." Malinek did not see any pattern in appellant's crimes that suggested he suffered from paraphilia.

Despite concluding that appellant did not meet the second SVP criterion, Malinek considered the Static-99R and Static-2002R tests. Malinek assigned appellant a score of six on the Static-99R, placing him in the high-risk category, and a score of seven on the Static-2002R, placing him in the moderate-high risk category. Although Malinek's assessments placed appellant in the same risk categories as Webber's and North's assessments, the scores he gave appellant were lower because he did not factor in the alleged abuse against the six-year-old boy or other alleged sex offenses that did not result in convictions. Malinek also testified that the Static tests inflated the risks posed by appellant.

### B. Documentary Evidence

The trial court admitted four defense exhibits into evidence. The first, Exhibit A, was Malinek's curriculum vitae. The remaining three exhibits were abstracts of judgment for appellant's convictions for lewd acts upon Liza (Exhibit D), assault against his girlfriend or fiancée (Exhibit E), and attempted rape against Tanya (Exhibit F).

### DISCUSSION

## I. Motion to Stay

### A. Background

Prior to appellant's trial, his attorney filed a motion to stay the proceedings due to appellant's alleged incompetency. In the motion, counsel alleged that "the competency at issue . . . is one of communication with counsel and his doctors." She explained, "Mr. Burroughs has chosen to refuse to talk with counsel.

23

Retraining and specific counseling could bring him back to the table." Counsel contended that the proceedings needed to be stayed to protect appellant's due process rights and his statutory right to counsel.

The People opposed the motion. They primarily relied on *Moore, supra,* 50 Cal.4th at p. 829, in which the Supreme Court held that "due process does not require mental competence on the part of someone undergoing a commitment or recommitment trial under the SVPA." The People also pointed out "that in many SVP cases, the inmate refuses to speak to the evaluators for a variety of reasons, and yet the hearing proceeds."

At the hearing on the motion, appellant's counsel argued that *Moore* was distinguishable. Unlike the defendant in *Moore*, appellant had not previously been adjudicated an SVP, which counsel argued rendered "his ability to consult with the experts and counsel . . . even more important." Additionally, appellant did not blame his incompetence on a paraphilia diagnosis; he had been diagnosed only with ASPD and not paraphilia, and "has either chosen or for unmedicated reasons decided not to consult with counsel." Counsel asked the court to stay the proceedings and order Coalinga State Hospital to enroll appellant in "competency training" sessions. The People simply reiterated their contention that *Moore* was controlling.

The trial court ruled that *Moore* was binding and denied appellant's request for stay on that basis. The court acknowledged that appellant "probably should get competency training," but did not order Coalinga State Hospital to provide such training because it concluded it lacked statutory or other authority to do so.

B. **Analysis**

24

Appellant contends the trial court should have stayed the proceedings. He argues that *Moore* is distinguishable because the mental disorder that supported his SVP diagnosis is not the same mental illness that is the basis of his competency claim. He also argues that *Moore* was wrongly decided. We agree with the trial court that *Moore* is controlling and forecloses appellant's request.

In *Moore*, the Supreme Court considered the broad question whether individuals facing SVP proceedings have a due process right not to be tried or civilly committed while mentally incompetent. (*Moore*, *supra*, 50 Cal.4th at p. 807.) The defendant in *Moore* had been adjudicated an SVP; the prosecution had petitioned to extend his commitment. (*Id.* at p. 811.) He argued that the proceedings could not go forward because "the diagnosed mental disorders that make him a sexually dangerous predator also impair his mental competence to stand trial, and that the state therefore cannot try or commit him as an SVP unless or until his competence is restored." (*Id.* at p. 808.) Those disorders included "paraphilia, involving intense and recurrent sexual fantasies, urges, or acts against nonconsenting persons"; schizoaffective disorder with bipolar and psychotic components; and ASPD, "manifested by his persistent disregard of societal norms and the rights of others." (*Id.* at p. 810.) The defendant conceded that the SVPA did not provide a statutory basis for staying his proceedings, but contended that the fundamental liberty issues at stake in the proceedings weighed in favor of according him a due process right to mental competence analogous to that possessed by criminal defendants. (*Id.* at p. 812.)

The Supreme Court disagreed. In determining the process

due to SVP defendants, the Court employed a four-factor balancing test in which it considered "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (4) the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official." (*Moore*, *supra*, at 50 Cal.4th at p. 819.) The Court acknowledged that the liberty and dignitary interests of SVP defendants are significant. (*Id.* at p. 824.) It also recognized that "a mentally incompetent defendant may be in the position of 'filtering' his contribution in an SVP proceeding through counsel, experts, and other witnesses." (*Ibid.*) Nevertheless, the Court concluded that "the nature of the issues, evidence, and findings in an SVP proceeding prevents *any* defendant from playing much more than a supporting role," such that "any chance that an SVP's mental incompetence would significantly impair his contribution to his defense seems relatively attenuated." (*Ibid.*) Additionally, the Court found that the "numerous procedural safeguards" in SVP proceedings both "help mitigate the risk that an incompetent person would be erroneously adjudicated as an SVP in the first place" and afford committed SVPs regular placement reviews to further mitigate the effects of any error attributable to the reduced participation of a mentally incompetent defendant. (*Id.* at pp. 824-825.)

The Court also concluded that the strong governmental

26

interest in protecting the public by enforcing the SVPA "weigh[ed] against allowing SVPs to avoid being tried or committed while mentally incompetent." (*Moore, supra*, 50 Cal.4th at p. 825.)  The Court observed that this interest "would be substantially impaired if an alleged SVP could claim, based on his diagnosed mental disorders, that he was too incompetent to undergo a trial leading to such targeted confinement and treatment." (*Ibid.*)

Though the Court acknowledged that there probably was "significant potential overlap . . . between those mental disorders that qualify someone for commitment as an SVP on the one hand, and those that produce an inability to comprehend the proceedings or assist in one's defense on the other," it did not limit its holding to those situations.  (*Moore, supra*, 50 Cal.4th at p. 825.)  Appellant's contention that his case is distinguishable because he alleges incompetency stemming from a different mental disorder accordingly is not persuasive.  Under *Moore*, which we are bound to follow (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), "due process does not require mental competence on the part of someone undergoing a commitment or recommitment trial under the SVPA," regardless of the precise nature or source of the mental incompetence the defendant alleges.  (*Moore, supra*, 50 Cal.4th at p. 829.)

Appellant also contends that *Moore* was wrongly decided, and that the dissenting opinion authored by Justice Moreno "was the better reasoned."  He recognizes, however, that we cannot overrule the Supreme Court, and asserts that he raises the argument solely to preserve it for consideration by that body.  Unless and until the Supreme Court overrules *Moore*, appellant's due process claim cannot succeed here.

27

## II. Expert Testimony

### A. Background

Prior to trial, appellant moved in limine to restrict the scope of expert testimony in two ways. First, he argued that psychologists are not qualified to opine on what constitutes "qualifying prior convictions," "sexually violent offenses," or whether offenses are "predatory" in nature. He argued that such opinions "would not assist the jury" and instead would "usurp the job of the trier of fact."

Second, appellant contended that the experts should not be permitted to testify about the details of his uncharged offenses. As noted above, he argued that the details of those offenses were contained only in probation reports that constituted inadmissible hearsay as to uncharged offenses. He further argued that the hearsay was unreliable and could not serve as the basis of the experts' opinions. To the extent the experts could consider the information, he further contended, it would be improper for the experts to relate the contents of those or any other hearsay reports to the jury.

The trial court denied appellant's motions. It ruled that "the information on which the expert witnesses rely, specifically of a sexual nature, is relevant to determine whether in fact Mr. Burroughs is in fact a sexually violent predator." The trial court explained that "[t]he testimony is coming in for the basis of the expert's opinion. In my view it is coming in for a non-hearsay purpose." The court further ruled that "pursuant to Evidence Code section 352, that evidence is more probative than the issues in this case are damaging to Mr. Burroughs."

Later, appellant conducted a voir dire of Webber before she testified. At that hearing, Webber confirmed that she

considered the facts stated in police reports and probation reports during her evaluation of appellant. Webber explained that she believed a 1994 probation report setting forth the details of appellant's uncharged offenses was reliable because she had "no indications that it isn't reliable," and "typically the probation officer reports I see are consistent with underlying documents when I have the opportunity to review them." Webber also testified that she would have made the same diagnosis absent the information regarding appellant's juvenile criminal history and the 1988 crimes perpetrated by "Leo Boykins."

At the close of the voir dire hearing, appellant argued that the SVPA "does not say the actual details of the information comes before the jury. All it ever says is the witness may consider that information in formulating their opinion, and they can testify they consider information from juvenile records or police reports. The details are so biased or unnecessary to their opinion, that is not supposed to come before the jury." Appellant pointed the court to *People v. Otto* (2001) 26 Cal.4th 200 (*Otto*), which he also had cited in his motion in limine. The trial court ruled that "[t]he People may go into both the probation reports and police reports. I believe that is fair game how the doctors formed their opinion [*sic*]."

## B.    Testimony about nature of qualifying offenses

Appellant now contends that the People's experts improperly opined about the nature of his qualifying offenses. He argues that the "question of whether or not a specific offense qualified under the statute is a purely legal question which requires absolutely no mental health expertise to answer." Appellant exclusively relies on *People v. Stevens* (2015) 62 Cal.4th

29

325 (*Stevens*), a case addressing expert testimony in mentally disordered offender (MDO) proceedings. We agree with appellant that *Stevens* is analogous and that the expert opinions regarding the nature of appellant's qualifying offenses was improper. However, we further conclude that appellant was not prejudiced by this error, as probation reports containing the details of the offenses were properly admitted under *Otto* and plainly demonstrated that the offenses were sexually violent. Additionally, appellant's own expert testified that "[a]ll people referred for SVP meet this criteria," including appellant.

In *Stevens*, the Supreme Court considered the admissibility of expert testimony in MDO proceedings. Like SVP proceedings, MDO proceedings allow the civil commitment of a defendant if the People prove certain facts about the defendant and his crimes beyond a reasonable doubt. (See *Stevens*, *supra*, 62 Cal.4th at p. 328; *People v. Baker* (2012) 204 Cal.App.4th 1234, 1243.) In *Stevens*, the defendant had been convicted of petty theft with a prior. Before his scheduled release on parole, the Department of Corrections and Rehabilitation certified the defendant as an MDO under Penal Code section 2962, subdivision (d). Stevens challenged the determination at a bench trial. (*Stevens*, *supra*, 62 Cal.4th at p. 329.)

At that trial, the prosecution called as its only witness Dr. Kevin Perry, a clinical psychologist. Perry reviewed Stevens's medical and criminal records and concluded from them that he suffered from schizophrenia that "'was at least an aggravating factor' in the commission of his criminal act," the petty theft with prior. (*Id.* at p. 330.) According to Perry, Stevens stole about $27 worth of merchandise from a drug store, pushed a shopping cart at loss prevention agents who tried to stop him, and threatened

30

to assault and kill the agents.  (*Ibid.*)  Perry opined that threats to the agents' lives over such minor items demonstrated Stevens's irrational thought processes.  When the prosecutor asked Perry why, in his opinion, the crime of petty theft with a prior satisfied the MDO requirement that the crime involve violence or threats of violence likely to produce substantial physical harm, the court sustained Stevens's hearsay and foundation objections.  (*Ibid.*)  The court noted, however, that it already had Perry's testimony before it.  (*Ibid.*)  The court subsequently relied on that testimony to conclude that Stevens's offense involved the requisite violence or threats of violence; the prosecutor did not introduce into evidence the probation report from which Perry obtained the information about the offense.  (*Id.* at p. 331.)

The Supreme Court concluded that the expert's testimony could not support the trial court's finding.  It held that "in a commitment hearing under the MDO Act, the People may not prove the facts underlying the commitment offense (that are necessary to establish the qualifying offense) through a mental health expert's opinion testimony."  (*Stevens*, *supra*, 62 Cal.4th at p. 339.)  That was a problem in *Stevens* because the prosecution introduced only a rap sheet showing that Stevens suffered a conviction for petty theft with a prior; the record contained no evidence aside from Perry's testimony that the offense involved the violence or the threat of violence necessary to render it a qualifying offense under the MDO Act.  The Court emphasized that "although expert opinion testimony is required to determine some of the criteria in the MDO proceeding, it is not necessary, or even admissible, with respect to proving the underlying facts or elements of the offense to show that a defendant's crime qualified as an MDO Act commitment offense."  (*Stevens*, *supra*, 62 Cal.4th

31

at p. 336.) The Court explained that an expert in an MDO case may rely upon reliable hearsay documents to form his or her opinion as to factors within his or her expertise, such as whether a defendant's severe mental disorder caused or aggravated the commission of the underlying crime. However, because "proof of a qualifying conviction under the MDO Act is based on facts rather than on defendant's psychological condition," namely whether an offense involved violence, it "does not call for a mental health expert's opinion testimony." (*Ibid.*)

The Court rejected the prosecutor's contention that the legislative history of the MDO Act evinced the Legislature's intent to enlarge the role of mental health professionals in MDO proceedings by incorporating a mental health component into the violence requirement. (See *Stevens, supra*, at p. 337.) As pertinent here, the Court looked to a provision of the SVPA, Welfare and Institutions Code section 6600, subdivision (a)(3), to support its conclusion. (See *id.* at p. 338.) The Court noted that statute "created an exception to the rules of evidence to allow admission of multiple-level hearsay contained in . . . specified documents" and accordingly demonstrated that the Legislature knows how to craft such an exception when one is intended. (*Ibid.*) The Court continued, "Additionally, in SVP proceedings, the Legislature authorized proof of the details of a commitment offense through admission of *documentary evidence*, not expert testimony." (*Ibid.*, emphasis in original.)

Although we disagree with appellant's assertion that the *Stevens* Court "explicitly said that the evidence to which appellant objected was inadmissible, not just in an MDO case, but in an SVP case," we are persuaded that the reasoning in

32

*Stevens* is applicable to this case. Just as expert testimony is necessary to prove some elements of the prosecution's case in an MDO proceeding, "expert testimony is critical in an SVP commitment proceeding, in which the primary issue is not, as in a criminal trial, whether the individual committed certain acts, but rather involves a prediction about the individual's future behavior." (*People v. McKee* (2010) 47 Cal.4th 1172, 1192.) Mental health experts are necessary to establish that an SVP defendant suffers from a mental disorder that predisposes him or her to perpetrate sexually violent offenses, and that the defendant is likely to commit such offenses if released from custody. Experts are not necessary, however, to establish that the defendant suffered a conviction for a sexually violent offense.

The fact that a defendant suffered a prior conviction for an offense enumerated in the SVPA may be proven—and was proven in this case—by the introduction of a "section 969b prison packet." (See *Dean*, *supra*, 174 Cal.App.4th at p. 196 ; *People v. McGee*, *supra*, 38 Cal.4th at p. 702, fn. 8.) However, as appellant points out, a conviction for an offense listed in the SVPA is not necessarily a conviction for a "sexually violent offense." For a conviction to be "sexually violent," the acts underlying the conviction must have been committed "by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim, or threatening to retaliate in the future against the victim or any other person." (Welf. & Inst. Code, § 6600, subd. (b).) The People may prove this element in an SVP case by introducing "documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals." (Welf. & Inst. Code, § 6600, subd. (a)(3); see *Otto*,

*supra,* 26 Cal.4th at pp. 207-208.)  They may not, however, prove this element by relying solely upon the testimony of a mental health expert, whose expertise does not lie in such an area. Whether an offense is "sexually violent" is an issue a jury is competent to determine in any event.  (See *Stevens*, *supra*, 62 Cal.4th at pp. 336, 339.)

Here, the trial court admitted probation reports that recited the facts underlying appellant's qualifying offenses against Liza and Tanya. As appellant concedes and as we discuss more fully below, these documents were admissible to prove these facts. And, because the facts were proven independently, the experts were permitted to relate the facts to the jury as the basis of their opinions.  (See *Sanchez*, *supra*, 63 Cal.4th at p. 684.)

We agree with appellant, however, that it was improper for the experts to opine that the facts of the qualifying offenses rendered them "sexually violent" for purposes of the SVPA. Whether the convictions were "sexually violent" was a factual question that the experts were in no better position to resolve than the jury.  An expert's opinion is admissible only with respect to a subject "that is sufficiently beyond common experience that an opinion of an expert would assist the trier of fact," and whether an offense was violent or involved fear, duress, or menace was not a question the experts in this case were competent to answer.

Any error in admitting this testimony was harmless under any standard, however.  One of the probation reports admitted into evidence indicates that victim Liza was under the age of 14. This automatically rendered the enumerated offense against her a "sexually violent" one for purposes of the SVPA.  (Welf. & Inst. § 6600.1.)  The probation reports further indicate that appellant

34

used threats and violent force while perpetrating sexual offenses against both Liza and Tanya.  No reasonable jury could conclude from this evidence that the offenses were not "sexually violent."  Even if it could, appellant's expert Malinek testified that "[a]ll people referred for SVP meet this criteria," i.e., they have sustained a prior conviction for a sexually violent offense.  Indeed, appellant now acknowledges that he "cannot dispute that there is other evidence in the record besides the testimony of the government's experts to support the determination that he suffered at least one qualifying offense."  His unsupported speculations that "the relatively dry version of events found in the written exhibits was less significant than the versions of events provided by the testifying experts," and that "the jury probably did not look at the Exhibits" are insufficient to demonstrate prejudice.

### C.     Testimony about other offenses and conduct

Appellant contends the trial court erred by allowing the People's experts to testify to "a massive amount of inadmissible hearsay."  The 34 alleged hearsay statements appellant challenges fall into two general categories:  (1) details about uncharged offenses appellant allegedly committed in addition to his two qualifying offenses involving Liza and Tanya, and (2) details about appellant's behavior while in state custody.  Appellant argues that both groups of statements are inadmissible hearsay under *Sanchez*, *supra*, 63 Cal.4th 665, a recent Supreme Court case we invited the parties to address in supplemental briefing.  We agree.

#### 1.     Expert basis testimony after *Sanchez*

In SVP cases, the People must prove beyond a reasonable doubt that the defendant previously committed a sexually violent

offense and currently suffers from a mental disorder that renders him or her likely to commit sexually violent offenses in the future. To establish that a defendant suffers from a mental disorder, the People typically enlist an expert to evaluate the defendant and his or her history to make a diagnosis. As in many SVP cases (e.g., *People v. Angulo* (2005) 129 Cal.App.4th 1349, 1354, 1356), appellant refused to meet with the People's experts, leaving them largely dependent upon documentary evidence to ascertain and opine about his mental health status. Webber testified that it was customary for experts to rely on documents such as police reports, probation reports, and hospital records when evaluating potential SVPs, and all three experts in this case testified that they did so.

After denying appellant's motion in limine and other objections, the trial court allowed the People's experts to testify at length to the contents of these documents, including details of several offenses with which appellant was never charged and his behavior while in custody, on the ground that the documents formed the basis of the experts' opinions. The court denied appellant's request that the jury be admonished before each expert testified, as well as during the regular jury instructions, that the experts' testimony "relying on prior cases is not for the truth of the matter, but it goes directly to their opinion." The court did instruct the jury that "certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

At the time of appellant's trial, the general rule was that "out-of-court statements offered to support an expert's opinion are not hearsay because they are not offered for the truth of the matter asserted. Instead, they are offered for the purpose of

36

assessing the value of the expert's opinion." (*Dean, supra*, 174 Cal.App.4th at p. 193.)  That general rule was circumscribed to some extent; the Supreme Court recognized that prejudice could arise if an expert's detailed explanation placed incompetent hearsay evidence before the jury, and vested trial courts with discretion to exclude from the expert's testimony such hearsay that was more prejudicial than probative.  (*People v. Catlin* (2001) 26 Cal.4th 81, 137; *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619; *People v. Montiel* (1993) 5 Cal.4th 877, 918-919; *People v. Coleman* (1985) 38 Cal.3d 69, 92.)  Appellant unsuccessfully argued below that the testimony offered by the People's experts as the basis of their opinions lay beyond the confines of the general rule.

The Supreme Court recently updated the general rule in *Sanchez, supra*, 63 Cal.4th 665.  In that case, which involved testimony by a gang expert, the Court reevaluated "whether facts an expert relates as the basis for his opinion are properly considered to be admitted for their truth." (*Sanchez, supra*, 63 Cal.4th at p. 674.)[6]  It concluded that the long-standing

_____

[6] Although *Sanchez* was a criminal case, the Court stated its intention to "clarify the proper application of Evidence Code sections 801 and 802, relating to the scope of expert testimony," generally.  (*Id.* at p. 670.)  Those code sections govern the admission of expert testimony in civil cases as well, and nothing in *Sanchez* indicates that the Court intended to restrict its holdings regarding hearsay evidence to criminal cases.  The Attorney General did not attempt to argue otherwise.  We note that *Sanchez* also addresses issues relating to the constitutional right to confrontation.  Those portions of *Sanchez* are not relevant here, as the state and federal confrontation clauses are not applicable in SVP proceedings.  (*People v. Allen, supra*, 44 Cal.4th at pp.860-861.)

"paradigm" that testimony as to the basis for an expert's opinion is not hearsay "is no longer tenable because an expert's testimony regarding the basis for an opinion *must* be considered for its truth by the jury." (*Id.* at p. 679, emphasis in original.)

The Court began its analysis by recognizing that "[t]he hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Id.* at p. 676.) "This latitude is a matter of practicality. A physician is not required to personally replicate all medical experiments dating back to the time of Galen in order to relate generally accepted medical knowledge that will assist the jury in deciding the case at hand. An expert's testimony as to information generally accepted in the expert's area, or supported by his own experience, may usually be admitted to provide specialized context the jury will need to resolve an issue." (*Id.* at p. 675.) The Court contrasted this sort of testimony about general matters with expert testimony pertaining to "case-specific facts," which it noted "has traditionally been precluded" under hearsay rules. (*Id.* at p. 676.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*) Experts generally are not permitted to offer case-specific facts about which they have no personal knowledge. (*Ibid.*) The Court gave several examples illustrating the distinction. We repeat one here: "That an adult party to a lawsuit suffered a serious head injury at age four would be a case-specific fact. The fact could be established, inter alia, by a witness who saw the injury sustained, by a doctor who treated it, or by diagnostic medical records. How such an injury might be caused, or its potential long-term effects, would be background information an expert might provide. That the party

38

was still suffering from the effects of the injury and its manifestations would be the proper subject of the expert's opinion." (*Id.* at p. 677.)

When an expert relies on hearsay statements regarding case-specific facts, the Court explained, there is a "flaw in the not-for-the-truth limitation." (*Sanchez*, *supra*, 63 Cal.4th at p. 682.) That flaw was outlined by the U.S. Supreme Court in *Williams v. Illinois* (2012) 567 U.S. —, 132 S.Ct. 2221 (*Williams*), and described by the California Supreme Court as follows. "When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth. In such a case, 'the validity of [the expert's] opinion ultimately turn[s] on the truth' (*Williams*, *supra*, 567 U.S. at p. —, 132 S.Ct. at p. 2258 [conc. opn. of Thomas, J.].) of the hearsay statement. If the hearsay that the expert relies on and treats as true is *not* true, an important basis for the opinion is lacking." (*Sanchez*, *supra*, 63 Cal.4th at pp. 682-683.) Thus, "[w]hen an expert is not testifying in the form of a proper hypothetical question and no other evidence of the case-specific facts presented has or will be admitted, there is no denying that such facts are being considered by the expert, and offered to the jury, as true." (*Id.* at p. 684.)

The Court further concluded that the hearsay problem cannot be cured by instructing the jury not to consider expert basis testimony for its truth. "Once we recognize that the jury must consider expert basis testimony for its truth in order to evaluate the expert's opinion, hearsay and confrontation

problems cannot be avoided by giving a limiting instruction that such testimony should not be considered for its truth.  If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay.  Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception.  Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Sanchez*, *supra*, 63 Cal.4th at p. 684, fn. omitted.)  The Court disapproved its prior decisions holding that an expert's basis testimony is not admitted for its truth, or that a limiting instruction is sufficient to cure the hearsay problem.  (*Id.* at p. 686, fn. 13.)

The Court emphasized that an expert "may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Sanchez*, *supra*, at p. 685, emphases in original.)  "There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception." (*Id.* at p. 686.)  That distinction means that "[w]hat an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Ibid.*)

### 2.  Analysis

In this case, the People's experts related extensive a case-specific facts they gleaned from documents such as police reports, probation reports, and hospital records.[7]  The sole reason the trial

---

[7] No hospital records were introduced or admitted at trial.

court gave for admitting this testimony was that it served as the basis of their opinions.  Under *Sanchez*, admission of expert testimony about case-specific facts was error—unless the documentary evidence the experts relied upon was independently admissible.

### a.    Admissibility of documentary evidence

Appellant argues that much of the evidence was not admissible on any valid basis post-*Sanchez*.  In an exhibit-by-exhibit analysis, he contends that most of the People's exhibits— Exhibits 2, 3, 4A, 5A, 6, 8A, 9A, and 11—were inadmissible either in full or in part.  The Attorney General responds that appellant has forfeited many of these evidentiary challenges.  It contends that appellant forfeited all of his arguments about Exhibit 2 by failing to object to the exhibit below, and about Exhibit 3 by objecting only on foundation grounds.  The Attorney General further argues that appellant forfeited his challenges to the admissibility of portions of Exhibits 2, 3, 4A, 5A, 6, 8A, and 9A, because he "did not identify which portions of the exhibits were admissible and which were not," and "did not offer to redact the portions he now asserts were inadmissible on appeal."  The Attorney General does not make any forfeiture argument about

_____

Accordingly, any statements the experts made about the contents of those records as "the basis for their opinions" necessarily were improper under *Sanchez*.  The experts were permitted to rely on those records, and to rely on any reports other experts such as appellant's treating personnel prepared.  (*People v. Campos* (1995) 32 Cal.App.4th 304, 308; *People v. Landau* (2016) 246 Cal.App.4th 850, 870.)  They could not testify to the contents of those reports, however.  (*People v. Campos, supra,* 32 Cal.App.4th at p. 308; *People v. Landau, supra,* 246 Cal.App.4th at p. 870.)

41

Exhibit 11 but argues only that the exhibit was admissible.

We agree with the Attorney General that appellant has forfeited his objections to Exhibit 2, the section 969b prison packet, and Exhibit 3, the information charging him with offenses against Tanya. During trial, appellant's counsel expressly told the court that he had no objection to Exhibit 2, and objected to Exhibit 3 exclusively on foundational grounds.[8] In contrast, counsel expressly reiterated the hearsay objections she had been making throughout trial as to the remaining exhibits. The Attorney General's assertion that those objections were inadequately specific to preserve appellant's claims on appeal is not well taken.

In a motion in limine filed before trial, appellant argued that all references to uncharged offenses and conduct other than his qualifying offenses were inadmissible hearsay. While acknowledging that section 6600, subdivision (a)(3) renders admissible evidence pertaining to his qualifying offenses, he argued that there was no basis to admit evidence regarding offenses that were dismissed, uncharged, or otherwise non-qualifying. In other words, appellant conceded that parts of the

---

[8] Appellant contends his counsel was ineffective for failing to preserve his current objections to these exhibits. We disagree. Appellant concedes that substantial portions of both exhibits were admissible. To the extent that he claims his counsel was ineffective for failing to object to the inadmissible portions, he has not demonstrated that counsel's inherently tactical decision as to which exhibits to object to constituted deficient performance or prejudiced him in any way. (See *People v. Bolin* (1998) 18 Cal.4th 297, 333; *People v. Maury* (2003) 30 Cal.4th 342, 419; *Strickland v. Washington* (1984) 466 U.S. 668, 686-688.)

exhibits referring to his qualifying convictions were admissible, while arguing that other parts were not. "[I]t is settled law that where evidence is in part admissible, and in part inadmissible, 'the objectionable portion cannot be reached by a general objection to the entire [evidence], but the inadmissible portion must be specified.' [Citations.]" (*People v. Harris* (1978) 85 Cal.App.3d 954, 957.) Appellant adequately "specified" the inadmissible portion by drawing a qualitative distinction between concededly admissible evidence on the one hand and evidence he believed was inadmissible on the other. Appellant was not required, as the Attorney General suggests, to identify the specific lines and pages of each exhibit he believed were inadmissible to preserve his objections to portions of the exhibits on appeal. We accordingly consider appellant's arguments regarding exhibits 4A, 5A, 6, 8A, 9A, and 11.

Exhibits 5A and 9A are redacted pre-plea reports prepared by the probation office in connection with appellant's qualifying offenses against Tanya (5A) and Liza (9A). Appellant contends that these exhibits were inadmissible in toto because they are not presentence reports prepared following appellant's convictions. Appellant relies on *Otto*, *supra*, 26 Cal.4th 200 to support this contention. We conclude that his view of *Otto* is too restrictive.

In *Otto,* the Supreme Court considered the reach of section 6600, subdivision (a)(3). That statute provides in pertinent part that "The existence of any prior convictions may be shown with documentary evidence. The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports,

43

and evaluations by the State Department of State Hospitals." The Supreme Court confirmed that this statute, by its terms, "authorizes the use of hearsay in presentence reports to show the details underlying the commission of a predicate offense." (*Otto*, *supra*, 26 Cal.4th at p. 206.) The Court further held that section 6600, subdivision (a)(3) "implicitly authorizes the admission of hearsay statements in those reports." (*Id*. at p. 207.) The Court explained that because the probation and presentence reports expressly deemed admissible by the statute necessarily include hearsay statements from victims and police reports, "the Legislature necessarily endorsed the use of multiple-level-hearsay statements that do not otherwise fall within a hearsay exception." (*Id*. at p. 208.) The Court further explained that such an interpretation was consistent with the legislative history of the statute, which demonstrated that the Legislature "apparently intended to relieve victims of the burden and trauma of testifying about the details of the crimes underlying the prior convictions." (*Otto*, *supra*, 26 Cal.4th at p.208.) Thus, under *Otto*, "the only reasonable construction of section 6600(a)(3) is that it allows the use of multiple-level hearsay to prove the details of the sex offenses *for which the defendant was convicted*." (*Ibid*., emphasis added.)

Appellant is correct that the documents at issue in *Otto* were presentence reports, while Exhibits 5A and 9A are not. But the Court's holding in *Otto* reached the entirety of section 6600, subdivision (a)(3), not merely the presentence reports at issue in that case. Probation reports—the term appellant uses to identify these exhibits, which bear the heading "Probation Officer's Report"—are expressly included in the statute's non-exclusive list of documents the Legislature deemed sufficiently reliable to

44

prove qualifying convictions and the details thereof. Under *Otto*, then, those documents and the hearsay statements they contain are admissible to prove qualifying offenses and the details thereof.

As appellant argues and the Attorney General concedes, however, those reports "also contained information about appellant's prior record, adult history, personal history, physical/mental/emotional health, education, employment, and terms and conditions of probation," and "[t]hese sections were not admissible under section 6600, subdivision (a)(3)." Notably, these probation reports appear to be the only sources in the record that include the details of the uncharged sex offenses that appellant allegedly committed.[9]

Exhibits 4A and 8A are redacted police reports for appellant's qualifying offenses against Tanya (4A) and Liza (8A). Appellant contends these exhibits lack sufficient reliability to come within the section 6600, subdivision (a)(3) hearsay exception. We disagree. Section 6600, subdivision (a)(3) and *Otto* authorize the People to prove the details of appellant's qualifying offenses with probation reports. *Otto* explained that the sources of the details contained in those reports almost invariably are hearsay statements, either directly from victims or as related in police reports. The police reports underlying the qualifying offenses accordingly are the source of the admissible information in the probation reports, and therefore should be admissible

---

[9] During oral argument, appellant's counsel suggested that the People could have called the alleged victims of appellant's uncharged sex offenses to testify. We note that concern about the necessity of calling qualifying offense victims as witnesses in SVP proceedings was a factor in the Legislature's enactment of section 6600, subdivision (a)(3). (See *Otto, supra,* 26 Cal.4th at p. 208.)

themselves to prove the same information. To the extent that the police reports contained information duplicated in and properly admitted through the probation reports, any erroneous admission of the police reports could not have been prejudicial. (Appellant did not argue below that the police reports should have been excluded under Evidence Code section 352 as unduly cumulative.) To the extent the police reports contained information not also included in the admissible portions of the probation reports, appellant has not persuaded us that information was not pertinent to the details of the qualifying offenses and therefore inadmissible under section 6600, subdivision (a)(3).

Exhibit 6 is a minute order documenting appellant's guilty plea to sexually assaulting Tanya. We agree with the parties that the portion of the exhibit showing his guilty plea was admissible under section 6600, subdivision (a)(3) to show that appellant suffered a conviction for an offense listed in the SVPA. We further agree with the parties that the "remainder of the minute order, which listed appellant's sentence, restitution fine, and requirement to register as a sex offender, however, was not admissible under section 6600, subdivision (a)(3), because it did not pertain to the existence of the conviction or the details of same." Appellant also argues that the admissible portions of Exhibit 6 should have been excluded as cumulative under Evidence Code section 352, because an abstract of judgment documenting the same conviction was included in the section 969b prison packet. Appellant did not make this argument below and accordingly has forfeited it here.

Exhibit 11 is a one-page document from the Department of Justice. It contains fingerprints taken during the 1988 arrest of

46

one Leo Boykins for rape by force (Pen. Code, § 261, subd. (a)(2)), and lists Joseph Burroughs as Boykins's alias.  Appellant argues that Exhibit 11 should have been excluded because it does not relate to one of the qualifying offenses alleged by the People.  This argument is persuasive.  Section 6600, subdivision (a)(3) allows the People to prove the existence and details of predicate offenses by documentary evidence.  (*Otto*, *supra*, 26 Cal.4th at p. 206.)  The 1988 rape by force charge mentioned in Exhibit 11 was not one of the predicate offenses the People alleged.  Moreover, it is unclear from the record whether appellant was convicted of the 1988 forcible rape.  Thus, even under the broadest possible interpretation of the phrase "any prior conviction" in section 6600, subdivision (a)(3), Exhibit 11 was not admissible under that provision.  The Attorney General contends Exhibit 11 was admissible as an official record under Evidence Code section 1280.  For a writing to fall within this exception, it must be shown that:  "(a) The writing was made by and within the scope of duty of a public employee.  [¶]  (b) The writing was made at or near the time of the act, condition, or event.  [¶]  (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."  (Evid. Code, § 1280.)  No such showing was made here.

In sum, much of the documentary evidence upon which the experts relied was hearsay that was not shown to fall within a hearsay exception.  The trial court accordingly erred by allowing the experts to testify to the contents of this evidence as the basis for their opinions.

### b. Prejudice

Appellant contends the evidentiary errors were prejudicial.  "Ordinarily, an improper admission of hearsay would constitute

47

statutory error under the Evidence Code."  (*Sanchez, supra*, 63 Cal.4th at p. 685.)  To determine whether statutory error exists, we ask whether it is reasonably probable the verdict would have been more favorable to appellant absent the error.  (*People v. Watson, supra*, 46 Cal.2d at p. 836.)  Appellant contends we should apply the higher standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24, because his due process right to confrontation was violated.  (See *People v. Landau, supra*, 246 Cal.App.4th at p. 878.)  We need not decide whether it is appropriate to apply the *Chapman* standard here, as the evidentiary errors were prejudicial even under the lower *Watson* standard.

The People introduced numerous hearsay documents into evidence, and their experts related a significant amount of hearsay to the jury.  The documents and expert testimony described, in lurid detail, numerous sex offenses that appellant was not charged with or convicted of committing, including the repeated sodomy of a young boy and the use of a knife to penetrate a woman.  The experts also testified that appellant was a gang member and described bizarre and even "lethal" behavior appellant allegedly engaged in while in custody.  All of this evidence was exceedingly inflammatory.  It depicted appellant as someone with an irrepressible propensity to commit sexual offenses, and invited the jury to punish him for past offenses.  It also substantially enhanced the credibility of the experts' conclusions about appellant's mental state and likelihood of reoffending.  In short, the improperly admitted hearsay permeated the entirety of appellant's trial and strengthened crucial aspects of the People's case.

The Attorney General nonetheless contends that the errors

were harmless. The Attorney General argues that the People would have carried their burden of proof even absent the inadmissible evidence, and asserts that appellant's evidence was aimed at impugning other aspects of Webber's and North's testimony. According to the Attorney General, "the defense theory was that even if all of those things [the uncharged offenses and other misconduct] occurred, the diagnoses the prosecution's experts reached did not qualify appellant as a SVP, and their conclusions that he was likely to reoffend were incorrect because they relied on faulty data." Although this is a fair summary of appellant's arguments at trial, it does not take into account that these were perhaps the best arguments available to appellant in light of the court's evidentiary rulings. More importantly, it does not negate the significance of the inadmissible evidence to the strength of the People's case at trial. Had the inadmissible documentary evidence and hearsay testimony been excluded from trial, there is a reasonable probability that the jury would have returned a verdict more favorable to appellant.

## DISPOSITION

The judgment of the trial court is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

**CERTIFIED FOR PUBLICATION**

COLLINS, J.

49

We concur:


WILLHITE, Acting P. J.                                          MANELLA, J.