Filed 10/10/24  P. v. James CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EDBERT ROBERT JAMES, JR.,<br><br>        Defendant and Appellant. | A165982<br><br>(Contra Costa County Super. Ct. No. 02-334058-5) |

Defendant Edbert Robert James, Jr. appeals his convictions for second degree robbery, asserting the trial court improperly limited the testimony of his expert witness under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). We disagree and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The Contra Costa County District Attorney filed an amended information charging James with two counts of second degree robbery (§ 211; counts 1 & 4), assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1); count 2), and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 3).  The information further alleged a great bodily injury enhancement in connection with count 3 (§ 12022.7, subd. (a)), probation violations (§ 1203.3), and prior felony convictions (§ 1203, subd. (e)(4)).

---

[1] All further undesignated statutory references are to the Penal Code.

The charges arose from four incidents occurring in August and October, 2020. In August 2020, James entered a Chevron gas station and began taking chips and sandwiches from the shelves. When he was asked to leave, James became violent, threatened to kill the store manager, and left with various unpaid items.

In October 2020, James was in the parking lot of a Honda dealership prior to its opening time. When the service manager requested that James leave the premises, James began swinging a stick and claimed he was the boss and would fire the service manager.

Also in October 2020, a security guard working at the Del Norte Plaza shopping center encountered James inside a Walgreens. He observed James placing items in a shopping cart and arguing with Walgreens employees. James asserted he was the president and could do as he wished. When the security guard asked James to leave, James punched the security guard and left the store with a shopping cart containing unpaid items.

Two days later, James entered the same Walgreens, and the store manager asked him to leave. James threatened her with physical violence and proceeded to take various items from the store.

*People's Supplemental Motion in Limine No. 1*

Defense counsel identified Dr. Martin Williams as a potential defense witness. Prior to trial, the prosecutor filed a motion in limine (*Sanchez* motion) to "prohibit expert testimony as to case-specific hearsay." The prosecutor argued that while general background information may be discussed, " '[i]f it is case-specific hearsay and the witness has no personal knowledge of it, if no hearsay exception applies, and the expert treats the facts as true, the expert simply may not testify about it.' "

In advance of Dr. Williams's testimony, the parties and the court addressed the *Sanchez* motion. The court asked what evidence it was being asked to exclude. The prosecutor responded that Dr. Williams's report recounted his conversation with James, including James's statements that he was under the influence of alcohol and methamphetamine. Outside of the conversation with James, the report did not identify any other evidence supporting Dr. Williams's evaluation. As Dr. Williams's report arose "from case-specific hearsay or case-specific facts relayed to him by [James]," the prosecutor argued the entire report should be stricken.

In response, defense counsel argued the prosecutor was "conflating relaying hearsay and relying on hearsay." Counsel stated he had Dr. Williams watch the video of James's conduct from May 2020, and Dr. Williams "was able to immediately tell that [James] was under the influence of a central nervous system stimulant. Now, obviously, he couldn't tell which one. He gained that information pursuant to their conversation. But there was enough information for [Dr. Williams] to glean that there was something else in addition to the underlying medical condition." Counsel argued Dr. Williams should be "permitted to testify to his diagnosis and then explain, in general terms, that this was gleaned from an interview, a standardized test . . . and the viewing of these videos."

The court and defense counsel then engaged in the following exchange:

"THE COURT: So I'm looking at [the prosecution's] Supplemental Motion in Limine Number 1. . . . [¶] And it reads: The People move to exclude reference to all case-specific hearsay, including use of methamphetamine on any incident date. [¶] Do you have an objection to my granting that part of [the prosecution's] motion?

"MR. FREGI: No.

3

"THE COURT: That is granted. [¶] There's then a semicolon, and it says: History of drug use, including prior arrests, incidents or conviction. Any objection? [¶]

"MR. FREGI: No, I agree with that.

"THE COURT: · That is granted. There's another semicolon: · Medical records, along with any diagnoses or conclusions contained therein. Do you have an objection.

"MR. FREGI: · No?

"THE COURT: · That is granted. There's a semicolon: · And Defendant's out-of-court statements, unless and until such case-specific hearsay is independently proven or meets a recognized exception to the hearsay rule. [¶] Do you have an objection?

"MR. FREGI: · No.

"THE COURT: · That's granted."

Based on counsel's representations, the court concluded Dr. Williams "is going to be asked questions about having watched a video and to render an opinion based on that, based on generalized testing, and explain general matters. · And from my reading of the cases, all of that is allowed."

In response, the prosecutor asked for a section 402 hearing prior to any testimony by Dr. Williams. He asserted he had not been informed that Dr. Williams reviewed a video and argued that use of the video was only to confirm a diagnosis based on inadmissible hearsay.

The court refused to conduct a section 402 hearing, stating "Look, you guys had time to file in limine motions. I granted the one you filed. Now you're raising other issues that weren't raised before. We've got a jury that's waiting." The court asked defense counsel, "[W]hat are you gonna do about the fact that [the prosecution] is pointing out that your expert's diagnosis regarding methamphetamine disorder, or use disorder, can only be based on

4

what your client said, there's no other evidence of that. You even said, just looking at the video, the expert won't be able to say what substance it is." Defense counsel responded that Dr. Williams "can alter his opinion" and can talk hypothetically about "methamphetamine and the entire category of stimulants."

The court instructed the parties that there can be "no mention of methamphetamine unless you have a reasonable belief that that is coming before the jury in an admissible way. And if it's not, don't say those words." Defense counsel responded, "Fair enough."

*May 2020 Video Evidence*

The defense offered testimony from Officer Michael Olivieri, a police officer, and a related video. Olivieri stated he identified James as a suspect associated with an incident at a Walgreens. Olivieri testified that James repeatedly stated he was the owner, and his name was on an answering machine. James also stated to Olivieri "How do I steal something from myself?"

Olivieri's body-worn camera captured his interaction with James, and the video was played for the jury. In connection with the video, the court instructed the jury as follows: "You're going to hear in this exhibit statements from Mr. James, and you may only consider those statements for the limited purpose as they may show what Mr. James's state of mind was at the time the statements was made, that is May 27, 2020, as it may assist you in determining what the defendant's state of mind was at the time of the offenses alleged in Counts 1 and 4 in this case. · You may not consider the statements of for the truth of what's contained in them."

*Dr. Williams's Testimony*

The prosecutor again raised the *Sanchez* issue during trial, just prior to Dr. Williams taking the witness stand: "I just wanted to clarify the scope of Dr. Williams's testimony in regards to *Sanchez*. I know the Court had granted my supplemental motion in limine. I just wanted to confirm that . . . Dr. Williams is not permitted to testify to any of the statements he received directly from [James] during his interview with [James]. I think at this point my understanding of the ruling is that it was excluded. I just -- I want to make sure I'm on the same page before I start flinging objections and the Court has already decided."

Defense counsel responded, in relevant part, "I think [Dr. Williams is] entitled to talk about his diagnosis. I don't think he's entitled to talk about specific statements." Counsel further stated he was not going discuss the specifics of James's methamphetamine usage, but "I think due process requires that [Dr. Williams] be allowed to give a general opinion," say it is based on his evaluation, and "leave it at that."

The court then instructed the parties as follows: "I agree that the doctor can testify about the diagnosis. The doctor may not relate statements. And to the extent that the doctor may say that the opinion is based upon . . . a viewing of the video and an interview or an evaluation, I agree with the People that the doctor could not relate to the jury that the defendant may have . . . told the doctor that he is a user of or even a dependent on methamphetamine. The doctor may not say that. And then that leaves the prosecutor free to argue what if any weight should be given to an opinion of that diagnosis . . . ." The court further agreed that the only way Dr. Williams gets to the "methamphetamine dependency or meth-induced psychosis" is through his conversation with James, and so he "may not relate to the jury

6

an opinion that is based primarily on information that was given to him by the defendant, unless that information comes before the jury some other way."

Dr. Williams proceeded to testify on behalf of the defense. The court accepted him as an expert in "the general field of forensic psychology, [with a] focus on the treatment and diagnosis of mental diseases and disorders, especially delusional disorders" and as "an expert in the administration of mental status examinations." Over the prosecutor's objection, the court allowed Dr. Williams to testify that he conducted an evaluation of James. Dr. Williams opined that he had no indication James was malingering—i.e., faking a mental illness—and discussed his review of a video in which James repeated claimed to be the owner. Dr. Williams opined that James believed he was the owner and was experiencing a grandiose delusion. He stated, based on his professional judgment, that James's conduct in the video "was an accurate representation of what [James] really believed, sincerely and absolutely. I saw no evidence that he was attempting to create a certain illusion or a certain impression." He also discussed the difference in James's demeanor in the video verses when he evaluated James, noting James was much more agitated, energy "in the realm of mania," grandiose, and unreasonable in the video.

On cross examination, Dr. Williams stated his diagnosis was based on his general experience and knowledge, the video, and his hour-long interview with James. He confirmed he did not speak with any of the witnesses, watch any video from the date of the offenses, or observe James's demeanor around the time of the incidents. When the prosecutor sought to confirm all bases for Dr. Williams's diagnosis, Dr. Williams responded, "That's not an exhaustive list, but I'm not sure I'm permitted to discuss everything I considered."

7

Following a sidebar discussion, Dr. Williams testified, "Based on everything I know, I would say that's far more likely to be true than not true" that James was under delusions at the time of the incidents. The prosecutor then asked if Dr. Williams could reach a diagnosis if he excluded the content of what James told him during the interview and only consider James's demeanor and the video. Dr. Williams stated doing so is "unusual," but responded: "Yes. I would still say that more likely than not it would be the same opinion, that [James] was delusional at the time of the crimes."

Following his testimony and after the jury had been dismissed, the prosecutor put on the record that "there were multiple sideboards both during [defense counsel's] examination of Dr. Williams, as well as myself. I think it's fair to say a majority of them had to do with teetering on the line of the Court's rulings regarding *People v. Sanchez*. The Court ruled according to the Court's disposition." Defense counsel then responded, "I believe based on *Sanchez*, and hearsay in general, that the fact that there was an evaluation and an interview is not hearsay. The fact that he based his opinion in part on the interview is not hearsay. *Sanchez* specifically says that an expert can rely on hearsay. He just can't recite as true facts learned or case-specific hearsay. And I think it misled the jury to exclude, basically, the fact that there was an interview at all. I wasn't planning on getting anywhere near the content of the interview, and the doctor knew most certainly never to mention methamphetamine. But when you're asking the question that assumes that it didn't happen at all, you kind of put him in a tough spot because there was this interview that did play a role." Defense counsel concluded, "[T]he interview most certainly played a role in his concluding that he was suffering from delusions, and that is hearsay free. So

I think that Mr. James's due process rights were seriously trampled upon during the doctor's testimony in that regard."

*Verdict*

The jury found James guilty of both counts of second degree robbery (counts 1 & 4) and the lesser included offense of misdemeanor assault (count 3). The jury could not reach a verdict on count 2. The court sentenced James to a prison term of two years for count 1, a consecutive term of one year for count 4. The court also sentenced James to 180 days in county jail on count 3, which it deemed satisfied. James timely appealed.

**DISCUSSION**

James asserts the court erred by limiting the scope of Dr. Williams's testimony. He contends his expert was entitled to explain the basis for his opinion. He further asserts the statements at issue—that he was the president of Walgreens or owned the store—were not hearsay because they were not offered to "prove the truth of the matter stated."

## I. Waiver

As a preliminary matter, the Attorney General contends James waived his challenge to the court's ruling because he agreed his expert was not entitled to testify as to the content of the interview under *Sanchez*.

We agree James did not object to the court's order granting the People's Supplemental Motion in Limine No. 1. As such, any challenge to the validity of the court's order has been waived. (See *People v. Webster* (1991) 54 Cal.3d 411, 453–454 [defendant's failure to object to inadmissible evidence or request limiting instruction waived issue on appeal].)

However, we do not interpret James's current appeal as contesting the actual ruling but rather how it was applied to Dr. Williams's testimony. Defense counsel took issue with the prosecutor's final hypothetical, which

9

asked whether Dr. Williams would have reached the same diagnosis without the interview.  Following Dr. Williams's testimony, defense counsel argued as follows:

> "*Sanchez* specifically says that an expert can rely on hearsay. · He just can't recite as true facts learned or case-specific hearsay. · And I think it misled the jury to exclude, basically, the fact that there was an interview at all. · I wasn't planning on getting anywhere near the content of the interview, and the doctor knew most certainly never to mention methamphetamine. · But when you're asking the question that assumes that it didn't happen at all, you kind of put him in a tough spot because there was this interview that did play a role. · But again, he could say it played a role, but not say the content of it and not even mention the -- I mean, this is how it got -- he wasn't allowed to say he based his opinion on the interview, even though there was no diagnosis of him -- that the methamphetamine induced psychosis. · That was what we needed to stay away from.
>
> "But the interview most certainly played a role in his concluding that he was suffering from delusions, and that is hearsay free.  So I think that Mr. James's due process rights were seriously trampled upon during the doctor's testimony in that regard."

Accordingly, James adequately preserved his objection to the limits imposed on Dr. Williams's testimony.

## II.  Application of *Sanchez*

In *Sanchez*, *supra*, 63 Cal.4th 665, the California Supreme Court addressed whether an expert witness is prohibited from relating case-specific hearsay content in explaining the basis for his opinion.  (*Id.* at p. 670.)  The Supreme Court concluded as follows: "Any expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so.  Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion

rests." (*Id.* at pp. 685–686.) However, "[w]hat an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.)

Courts have applied *Sanchez* to various categories of expert testimony, including unsupported hearsay regarding a defendant's history. (See, e.g., *People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 511 [*Sanchez* barred "expert's unsupported characterization of defendant's purported 'lengthy history' of rule violations, his purported decompensation . . . , and his hostile and aggressive interpersonal relations"]; *People v. Burroughs* (2016) 6 Cal.App.5th 378, 407, 410–411 [expert psychologists improperly testified to case-specific facts from hearsay documents "about appellant's prior record, adult history, personal history, physical/mental/ emotional health, education, employment, and terms and conditions of probation"]; cf. *People v. Camacho* (2022) 14 Cal.5th 77, 131 [each basis for expert's diagnosis that defendant suffered from antisocial personality disorder "was independently established by other admissible evidence introduced at trial," including wife's testimony that defendant "had a drug problem 'for a long time.' "].)

James argues *Sanchez* is irrelevant because the statements at issue— that he was the president of Walgreens or owned the store—were not true, and "Dr. Williams was not treating the statements as true." However, nothing in the record indicates Dr. Williams was prohibited from discussing those statements. And, in fact, Dr. Williams testified about a video interaction between James and the police in which James proclaimed to be the owner of Walgreens. Dr. Williams testified regarding James's demeanor in the video, noting James "was aware that his claim to be the owner would be hard to believe" but concluding "I believe [James] believed it." Dr.

11

Williams further testified that James's statement of " 'How do I steal from myself?' " was "consistent with [James's] delusional belief that he owned Walgreens," the statement fell within "the category of grandiose delusions," and James's demeanor during the video was within "the realm of mania . . . . Too much energy, too much excitability, too much grandiosity." Dr. Williams concluded by providing his "professional medical opinion" that James was "suffering from delusion" in the video and when he committed the charged crimes.

James argued before this court that Dr. Williams was precluded from comparing James's demeanor in their interview to James' conduct as represented in the video. This argument misrepresents the trial record, as Dr. Williams was specifically asked about James's demeanor in their interview. And the court permitted Dr. Williams to testify that James's demeanor during their interview was akin to how he was then-currently presenting in court, which was a normal demeanor. He compared James's normal presentation to his presentation on the video, which Dr. Williams described as "above normal. Too much energy, too much excitability, too much grandiosity."

Nor was Dr. Williams prohibited from explaining the basis for his expert opinion. He testified his opinion was based on his review of the video interaction between James and the police, James's demeanor during their one-hour interview, his knowledge of mental illness and homeless people, and his "experience with well over a thousand criminal defendants."

The only limits on Dr. Williams's testimony—as reflected in the appellate record—was Dr. Williams's diagnosis of a methamphetamine use disorder and his statement that he reviewed James's life history. As to the first limit, we note James does not argue on appeal that this diagnosis or his

12

statements to Dr. Williams regarding methamphetamine usage should have been admitted. And the court's order precluding such reference directly complies with *Sanchez*. Dr. Williams was required to treat James's hearsay statements of past usage as true in order to reach his methamphetamine use disorder diagnosis, and defense counsel did not offer any non-hearsay evidence of James's methamphetamine use. Accordingly, the court properly precluded Dr. Williams from "relat[ing] as true case-specific facts asserted in hearsay statements" that were neither "independently proven by competent evidence" nor "covered by a hearsay exception." (See *Sanchez, supra*, 63 Cal.4th at p. 686.)

Regarding the single trial objection to Dr. Williams's statement that he "go[es] over the person's entire life history," James did not raise this issue on appeal. Accordingly, any objection has been waived. (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 620 [" '[W]hen an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' "].)

## III. Harmless Error

Even if the court erred in limiting the scope of Dr. Williams's testimony, we conclude such error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836–837 (*Watson*) [state law error measured under reasonable probability standard]; *People v. Cunningham* (2001) 25 Cal.4th 926, 999 [evidentiary ruling "if erroneous, is 'an error of law merely,' which is governed by the standard of review announced in [*Watson*]"]; *People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 510 [applying *Watson* standard to alleged *Sanchez* violation].)[2] Any prejudice from the court limiting Dr. Williams's

---

[2] James asserts error under the federal harmless error standard in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). Regardless, for the

testimony was substantially mitigated by the extensive evidence and arguments made at trial regarding James's statements about being the "president" and "owner" of Walgreens.

Defense counsel referenced James's statements of ownership repeatedly in his opening statement, and framed the issue for the jury as whether James "honestly, albeit it [sic] unreasonably, delusionally, but did he honestly believe that he owned these establishments and, therefore, had a right to these products?"

Multiple witness then proceeded to testify about their interactions with James and statements he made regarding his asserted ownership of Walgreens. For example, Thomas Sumner testified that he encountered James shoplifting in a Walgreens store while working as a security guard. When he asked James to leave the store, James became physically violent and "made a statement that he owns the store and that he could take what he wanted" while he was walking out of the store with a shopping cart full of items. Sumner further testified that James made this statement "on other occasions" when they interacted, and James appeared to be serious in making such claims. Likewise, Kim Fong, a manager for that same Walgreens, testified James told her that "he was the president . . . of Walgreens," and "own[ed] this place." In a similar interaction, Wayne Rosemont, the service manager at Honda of El Cerrito testified James repeatedly claimed to own the dealership and threatened to fire him. Responding police officers also confirmed that James would claim to own or be the president or CEO of the places at issue.

---

reasons set forth in this section we conclude the error was harmless under either the *Chapman* or *Watson* standard.

In addition to witness testimony, the defense played the May 2020 video from a police officer's body-worn camera depicting an interaction between James and an officer after an incident at Walgreens. In that video, James also made statements regarding ownership of Walgreens.

The fact that James made such statements was never contested by the prosecution. During closing statements, the prosecutor acknowledged that James "makes statements that he's the manager. He's the president. He's the owner. . . . [¶] [N]one of that is in dispute." Rather, the prosecutor focused on how the jury should interpret such statements, asserting James's statements were not a genuine belief of ownership but rather an aggressive reaction when his theft was challenged. Defense counsel also repeatedly discussed James's statements regarding ownership during his summation and connected those statements to Dr. Williams's discussion of mental illness. Counsel noted how James acted "[l]ike he owned the spot," and argued "James honestly believed, albeit delusionally, but honestly believed that he was the owner of these establishments" and thus could not have the requisite intent to commit theft.

James also has not demonstrated any prejudice associated with the court's order striking Dr. Williams's statement that he considered James's life history, particularly in light of James's concession that Dr. Williams could not have conveyed any substantive information regarding his life history. Dr. Williams was allowed to state he relied on his general experience and knowledge, the video, and his hour-long interview with James; he was also allowed to note that these items are "not an exhaustive list, but I'm not sure I'm permitted to discuss everything I considered."

Finally, James has not demonstrated any prejudice associated with the prosecutor's final hypothetical, which asked Dr. Williams about whether he

15

would reach the same diagnosis if he did not consider his interview with James. Regardless of the propriety of the question, Dr. Williams testified he would still opine that James was suffering from delusions even without considering the interview.

The record indicates James was not deprived of his defense that he lacked the requisite intent for robbery. Counsel offered substantial evidence regarding James's statements of ownership and opined regarding how such evidence should be interpreted. Dr. Williams also opined on the meaning of that evidence and testified that James was suffering from grandiose delusions at the time of the crimes. Accordingly, James has failed to demonstrate any prejudice associated with the court's ruling.

## DISPOSITION

The judgment is affirmed.

16

_____
PETROU, J.

WE CONCUR:


_____
FUJISAKI, ACTING P. J.


_____
RODRÍGUEZ, J.


*People v. James*/A165982

17