Filed 10/14/24  P. v. Burroughs CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH BURROUGHS,<br><br>Defendant and Appellant. | B332383<br><br>(Los Angeles County<br>Super. Ct. No. ZM014605) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David V. Herriford, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

This is the second appeal by Joseph Burroughs from a jury verdict adjudicating him a sexually violent predator (SVP) under the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.),[1] and ordering his indeterminate commitment to Coalinga State Hospital (Coalinga). In *People v. Burroughs* (2016) 6 Cal.App.5th 378 (*Burroughs*), a different panel of this court reversed the jury's finding based on prejudicial errors in the admission of expert testimony at trial. Upon retrial, the jury again found that appellant met the definition of an SVP.

In this appeal, appellant contends that there was insufficient evidence to support the jury's finding beyond a reasonable doubt. He argues that the prosecution's experts relied only on his predicate offenses, which he committed decades ago, and discounted his subsequent good behavior during his commitment. As such, he contends that the experts' conclusions that he remained at serious risk of reoffending were improperly based on speculation rather than evidence that he has a current mental disorder that would make it likely he would commit a violent sexual offense if released. We find no prejudicial error and affirm the judgment.

## PROCEDURAL HISTORY

We take the following, in part, from the opinion in appellant's first appeal, *Burroughs, supra,* 6 Cal.App.5th 378. On May 12, 2009, the Los Angeles County District Attorney ("the People") filed a petition pursuant to section 6601 to commit appellant as an SVP. (*Id*. at p. 383.) An SVP is "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) Under the SVPA, the People may seek to confine and treat SVPs "until their dangerous disorders recede and they no longer pose a societal threat." (*Moore v. Superior Court* (2010) 50 Cal.4th 802, 815 (*Moore*).) The special proceedings that follow are civil in nature, but an SVP defendant retains many procedural protections afforded criminal defendants, such as the right to court-appointed counsel and experts, the right to a unanimous

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

jury verdict, the right to testify in one's defense, and the right to have the People prove his or her SVP status beyond a reasonable doubt. (*Burroughs, supra*, 6 Cal.App.5th at p. 384, citing *Moore, supra*, 50 Cal.4th at pp. 816–817; see also *People v. Allen* (2008) 44 Cal.4th 843, 861, 870.)

Following a trial in August 2015, the jury returned a verdict finding true the allegation that appellant was an SVP within the meaning of the SVPA. The trial court ordered him committed to Coalinga State Hospital for an indeterminate term. (*Burroughs, supra*, 6 Cal.App.5th at p. 384.) Appellant appealed. A different panel of this court reversed the judgment, finding that some of the expert testimony at trial was based on inadmissible hearsay and that the admission of that testimony was prejudicial. (*Burroughs, supra,* 6 Cal.App.5th at pp. 411-412.) This court accordingly remanded the matter to the trial court for further proceedings. (*Id*. at p. 413.)

On remand, a second trial was held in June 2023. Appellant waived his appearance for trial and was not present. On July 6, 2023, the jury returned a verdict, again finding true the allegation that appellant was an SVP within the meaning of the SVPA. The court ordered appellant committed to Coalinga for an indeterminate term. Appellant timely appealed.

FACTUAL BACKGROUND

The People presented three experts who opined that appellant met all three statutory elements to be classified as an SVP. The three elements are: "(1) conviction of a 'sexually violent offense'; (2) a diagnosed mental disorder that makes a person a danger to the health and safety of others; and (3) the mental disorder makes it likely the defendant will engage in 'sexually violent criminal behavior.' [Citation.]" (*People v. White* (2016) 3 Cal.App.5th 433, 448; see also § 6600, subd. (a)(1).) Only the second and third elements are contested here.

## I. Qualifying Sexually Violent Offenses

It was undisputed at trial that appellant was convicted of two sexually violent offenses that met the first element under section 6600. In 1994, appellant committed lewd and lascivious acts with the 13-year-old child of a woman he was dating. He was convicted of the offense and sentenced to probation. In 1995, he was convicted of assault with a deadly weapon, his

3

probation was revoked, and he was sentenced to prison. After his release, he attempted to rape a 19-year-old neighbor in 1996. He was convicted of assault with intent to rape in 1997. All the experts testified at trial that the 1994 and 1997 convictions qualified under the SVPA.

## II. The People's Evidence

### A. Dr. Busby

Dr. Tricia Busby is a clinical psychologist who provides SVP evaluations for the state of California. She received a referral to evaluate appellant in April 2022. Appellant refused to interview with her, so she relied on her review of his medical, court, and prison records.

Busby diagnosed appellant with unspecified schizophrenic spectrum and other psychotic disorder, and with antisocial personality disorder (ASPD). She concluded that appellant met the second SVP criterion: he had a mental disorder that predisposed him to commit sexually violent offenses. She explained that appellant met the criteria for ASPD as demonstrated by his crimes, because he denied committing the offenses, was impulsive and did not think about the consequences, lacked remorse, and used aliases and deception to gain access to his victims. Busby testified that appellant was volitionally impaired and unable to control his sexual behavior, noting that he reoffended a short time after release from his first conviction. She also noted that during his first offense, appellant continued to try to sexually assault the daughter even after the mother walked in, which further demonstrated "a lack of ability to manage his behavior." She also found that appellant exhibited emotional impairment, as he "does what he wants and doesn't consider how his sexual behavior impacts his victims."

Regarding his current behavior in the hospital, Busby testified that appellant kept to himself, did not "socialize very well with others," and did not speak to staff "unless he has a need that needs to be met." Other than an incident in December 2022, appellant had not "shown any aggressions" since 2014 and was "low-risk for in-patient violence." In 2022, appellant received multiple DVDs containing pornography, titled "Naughty Teen Girls or something like that."[2] Although appellant was allowed to possess

---

[2] A defense expert later testified that the title was "Naughty Teen Whores."

4

pornography at the hospital, Busby explained that the incident was relevant because it demonstrated that appellant still had sexual interest and it was concerning because appellant's victims were teenagers. This concern was heightened because appellant was not involved in treatment at the hospital and had "not addressed the reasons for his past sexual offending. He hadn't addressed his dynamic risk factors or [*sic*] sexual re-offense. And so he also doesn't talk to staff which is problematic in my opinion because we don't know what's happening . . . with Mr. Burroughs necessarily." Given these indications of appellant's current mental state, she opined that the second criterion was met.

Busby also opined that appellant met the third criterion for an SVP, likeliness to engage in sexually violent predatory criminal behavior as a result of his diagnosed mental disorder without appropriate treatment in custody. To reach this conclusion, Busby used an actuarial instrument, the Static-99R, to assess the risk level of recidivism. She testified that the highest score possible is a 12 and the average score for a sex offender is 2. Appellant received a score of 7, placing him in the well-above-average category of risk of re-offense. She explained that recidivism often wanes after the age of 60, at which point appellant's score would go down. Busby also used another assessment tool, the Stable 2007, which evaluates dynamic risk factors. On that test, appellant scored a 15, in the high range for reoffending. Combining the two scores gives the evaluator a modified percentage for future risk of reoffending, which Busby explained provides additional predictive validity for the results. For appellant, Busby testified that his risk of reoffending within five years was 27 percent, meaning that 27 out of 100 people with that score would reoffend. Busby noted that if appellant were participating in sex offender treatment in the hospital, his dynamic score would be lower. As a result, she concluded that appellant met the criteria and needed treatment and supervision for the safety of the community.

On cross-examination, Busby acknowledged that although appellant had exhibited aggressive and hostile behavior early in his time at Coalinga, the last incident she recalled was in 2014. She noted that more recently, appellant would get "irritable when the treatment team tries to encourage him to participate in treatment," but "for the most part he doesn't yell or

5

become violent." She discussed two earlier incidents, one in 2013 when appellant threatened a staff member and one in 2014 when he yelled at a staff member while clenching his fists. She also noted a more recent incident involving deceit by appellant. In 2018, appellant received a package with shampoo bottles containing alcohol, then refused to directly answer questions about it. She agreed that appellant had demonstrated less irresponsibility recently, as he had been employed consistently in the hospital for the past five or six years.

Busby also testified about the difficulty in diagnosing appellant with a schizophrenic disorder because he refused to speak with clinical staff or evaluators. However, she identified behaviors by appellant that would suggest schizophrenia, including that he "perseverates on religious themes which can be a symptom of schizophrenia."

He had also been observed speaking on the phone to a dial tone, mumbling to himself, and making unusual jerking movements, all of which would be indicative of schizophrenia. She was not aware that appellant had acted out sexually during his time at Coalinga or of any evidence of any sexually themed delusions or sexual command hallucinations. However, she noted that an evaluator would generally get that information from interviewing the patient. She also noted that although appellant had not had recent instances of impulsive behavior, the manual for the Static-99R instructs the evaluator to consider that a person's behavior in a structured, confined environment will be different than in the community. She considered that in her evaluation, as well as the fact that appellant had not addressed the risk factors through treatment. She opined that outside of a structured environment, especially given that appellant had demonstrated that he still had sexual interests, "because of his emotional impairment he will essentially give into his sexual desires and needs because he hadn't learned the skills necessary to engage in a 'normal' . . . relationship with someone to get his sexual needs met."

### B.    Dr. Flinton

Dr. Charles Flinton, a forensic psychologist, testified that he had worked almost exclusively with violent and sexual offenders since 1992 and had performed over 500 sexual offender evaluations. He evaluated appellant

in 2018 and 2022; both times appellant refused to meet with him.  He reviewed appellant's criminal records, prison records, and hospital records, and spoke with individuals at the Department of State Hospitals regarding appellant.

Flinton diagnosed appellant with ASPD, based on appellant's early criminal conduct starting at age 14 and continuing into adulthood.  He also testified that appellant's two predicate crimes were consistent with this diagnosis, as appellant was driven to commit the crimes "by his own desire without an understanding or concern for the impact on the other person. Flinton acknowledged that appellant had not been getting into trouble in the hospital, had been described as "pretty polite," and that ASPD often decreases as a person ages.  But he opined that appellant still met the criteria for ASPD because he remained "resistant to authority," did not participate in treatment, and did not always follow the rules.  Flinton also opined that appellant's ability to behave in a custodial setting did not mean that appellant lacked the internal drive to act out and thus did not establish that appellant would behave similarly well once released.  In particular, Flinton explained that during his predicate offenses, appellant took great efforts not to get caught, including threatening the victims.  However, in a hospital setting, appellant was much more likely to be caught and was therefore less likely to engage in the behavior.  He concluded that appellant "suffers from antisocial personality disorder in which he is willing to work to achieve his own ends despite the impact on others."  Flinton testified that appellant met the second criteria "without a doubt," as his mental disorder predisposed him to the commission of criminal sexual acts.  He found that appellant lacked volitional and emotional control and there was "no evidence to suggest that he has gained insight or has made efforts to change his behavior."  Flinton also noted that appellant was not participating in treatment, so he could not be part of the sexual offender conditional release program, which would allow the evaluators to observe his behavior in the community.

Flinton also opined that appellant continued to pose a serious well-founded risk to the community.  He noted that sexual recidivism often goes down markedly after age 60, but appellant, at age 52, was still "well above

7

the average risk for sexual re-offense." Using the Static-99R, he scored appellant as a 6, in the category of "well above average risk." He also opined that appellant was unlikely to participate in treatment if released.

Flinton did not diagnose appellant with any psychotic disorder, because he felt he could not fully assess appellant without an interview. Flinton acknowledged that appellant had not recently broken any rules at the hospital, but noted that appellant was under "pretty close supervision" and did well in the custodial environment. Flinton also testified that while in prison appellant "had a long list of rule violations including mutual combat." He also noted that appellant was not taking any medication and had instances where he was "somewhat verbally aggressive. He talks to himself. He seems disorganized." Flinton testified that appellant demonstrated impulsive behavior while out of custody, including failing to learn from experience and respond to consequences, and that treatment and proper community integration would be key to reducing appellant's risk.

### C.    Dr. Korpi

Dr. Douglas Korpi, forensic psychologist, testified that he had completed approximately 1,300 SVP evaluations since 1997. He evaluated appellant in 2018, 2022, and 2023. He too was limited to appellant's file, as appellant refused to be interviewed. Korpi also talked to staff at Coalinga regarding appellant.

Korpi diagnosed appellant with ASPD and schizophrenia. He described appellant as a "high functioning schizophrenic." He found that appellant had volitional or emotional incapacity that predisposed him to criminal sexual acts, thus meeting the second SVP criterion. He testified that it was "some combination of [appellant's] antisocial orientation and schizophrenia that disallows himself the control necessary to resist his baser impulses." Regarding appellant's conduct at Coalinga, he testified that appellant had "self-control most of the time," and that the hospital was a helpful setting for him, but that appellant "sometimes . . . just can't help himself." Korpi expressed concern that upon release, appellant "would face some sort of stressor and . . . once again become actively psychotic and act in an irrational and imprudent . . . fashion as he has in the past." He opined that appellant would have benefited from the sexual offender treatment program at the

8

hospital, to learn coping strategies for triggers. Korpi agreed that ASPD by itself rarely was sufficient to establish a predisposition to criminal sexual acts. However, he concluded that this was one such rare case where appellant was "so sexually preoccupied and so antisocial, [these] join up together . . . to be predisposed to criminal sexual acts."

Korpi assessed appellant using the Static-99R. He initially gave appellant a score of a 5 or 6, but upon review of additional documents, he changed the score to an 8. He opined that appellant would not seek treatment if released. He also considered appellant's receipt of the DVDs in 2022 as evidence of appellant's continuing sexual desires. Korpi noted that appellant's risk level had improved from when he was first institutionalized, based on the fact that he had not gotten in trouble in the past 10 years, had held a job, and was older. But even taking those factors into account, he believed appellant met the criteria for an SVP.

On cross-examination, Korpi testified that there was no "evidence that [appellant] is currently manifesting sexually inappropriate behavior," but that "when he's predisposed, a predisposition never leaves you." He opined the link between schizophrenia and sexually violent offenses is the lack of good judgment and self-control.

## III. Defense evidence

### A. Dr. Malinek

Dr. Hy Malinek, a clinical forensic psychologist, also testified for the defense in appellant's first trial. He has been a member of the state SVP expert panel for 26 years and has done close to 1,000 SVP evaluations. Malinek met and spoke with appellant twice in 2009 and once in 2013, but in each instance appellant declined to be interviewed.

Malinek diagnosed appellant with ASPD and schizophrenia. He opined that appellant had a weaker form of ASPD, noting that his behavior had improved substantially in the past 10 years. Appellant was quiet, kept to himself, "engages in weird behavior sometimes," and did not "relate to anyone much," but showed no evidence of aggression. Malinek did not believe that the ASPD diagnosis established a predisposition to committing sexually violent criminal offenses. He opined that appellant previously met the SVP criteria in his 20s and early 30s, but had "aged out of it." He explained that

9

there was no evidence for the past 15 years of "sexual preoccupation and aggression or misconduct or inappropriate behavior" by appellant. Malinek also opined that if appellant's schizophrenia were accompanied by sexual perversion "we would have had some evidence of it."

Malinek administered the Static-99R and gave appellant a score of 6. He explained that score was "above average" and put appellant into a group where about 20 out of 100 people would reoffend. Despite this risk assessment, he opined that appellant did not have a mental disorder currently that predisposed him to commit a sexually violent offense. He testified that appellant was "fragile and frail and has a major mental illness and needs to be monitored. I don't know that [the] SVP program at Coalinga is the right place for him."

On cross-examination, Malinek acknowledged that he wrote in his May 2023 report that appellant had a "powerful antisocial personality disorder" and that men with "entrenched antisocial attitudes like [appellant] think primarily of themselves" and disregard legal boundaries and the safety of victims. He also agreed that an ASPD diagnosis could support an SVP finding in rare cases. He opined that appellant's case was "unique" because he was diagnosed with both ASPD and schizophrenia. He explained that it was unusual to have both "major mental illness and a history of sexual offenses. [Appellant's] behavior has been weird." He stated that appellant was difficult to diagnose, and the doctors disagreed as to his diagnoses. He doubted that appellant would seek treatment outside of the hospital.

Malinek also admitted that he had testified in 2015 that appellant was violent and dangerous, but he believed appellant was less dangerous now. He opined that appellant "needs help in monitoring and assistance by the state," and it was possible that appellant could become dangerous and act out inappropriately again, but he did not believe appellant met the SVP criteria. Malinek previously testified that evidence of sexual preoccupation could include watching pornography all the time. He acknowledged several instances in the record reporting that appellant was watching pornography at Coalinga, including a nursing report from November 2020 stating that appellant was watching pornography all day.

10

**B.     Dr. North**

Psychologist Dr. Christopher North testified for the People at appellant's first trial.  He had performed close to 2,000 SVP evaluations since 1995.  He evaluated appellant six times, beginning in 2009.  He based his evaluations on review of his records, as appellant again declined an interview.

North diagnosed appellant with ASPD and schizophrenia.  Even though it had improved over the last five to 10 years, North opined that appellant's ASPD currently predisposed him to commission of sexually violent criminal offenses.  He did not believe the same was true of appellant's schizophrenia.

North gave appellant a score of 7 on the Static-99R.  He concluded in 2015 that appellant met all three criteria to qualify as an SVP. However, as of 2018, he concluded that over time appellant had been behaving well, had no reported problems, no evidence of sexual preoccupation, and no sexually inappropriate behavior.  As a result, he opined that appellant was no longer likely to commit a sexually violent offense.  North still believed that appellant posed "some" risk and had some concerns, but he did not think appellant was likely to re-offend.

North acknowledged that it was not likely that appellant would seek treatment upon release.  He also testified that appellant could have reduced his risk of reoffending if he participated in treatment.  He noted that while appellant did well in the structured hospital setting, if released into the community, appellant could experience increased stress, which could result in "more antisocial behavior.  He's gonna get angry.  He might explode."

North admitted that he had not previously seen the nurse's note from 2020 reporting that appellant "spends the majority of time in the dorm watching porn."  Regarding the DVDs, he agreed that it was relevant that appellant wanted to keep them as it indicated information about his sex drive.  The fact that "teen" was in the title was "somewhat concerning" and related to the predicate crimes.  It also demonstrated poor judgment.  North also noted that appellant did not think he had a problem with sex offending.

## C. Piatt

Jennifer Piatt, a clinical social worker at Coalinga, testified that appellant had been a patient on her unit for the past 5 months. She reported that appellant was "very well-behaved," "low-key," and "very polite to staff." She also testified that he "interacts in a social manner with peers." She was not aware of any behavioral incidents involving appellant.

## DISCUSSION

Appellant contends that there was insufficient evidence to establish beyond a reasonable doubt that he was an SVP. Specifically, he argues that the People's experts relied only on his past conduct and therefore lacked a sufficient basis to conclude that he *currently* suffered from a mental disorder that predisposed him to commit future sexually violent offenses or that he posed a serious and well-founded risk of sexually reoffending, both of which are required for continued commitment as an SVP. We conclude that the record contains substantial evidence to support the jury's finding.

## I. Legal Principles

As noted earlier, to commit a defendant as an SVP, the People must prove three elements beyond a reasonable doubt: "(1) [defendant's] conviction of a 'sexually violent offense'; (2) a diagnosed mental disorder that makes [the defendant] a danger to the health and safety of others; and (3) the mental disorder makes it likely the defendant will engage in 'sexually violent criminal behavior.'" (*White, supra,* 3 Cal.App.5th at p. 448; § 6600, subd. (a)(1).) Appellant challenges the sufficiency of the evidence supporting the second and third elements.

A person is likely to engage in sexually violent criminal behavior if, "because of the person's diagnosed mental disorder, he or she currently presents a *substantial* danger—that is, a *serious and well-founded risk*—of criminal sexual violence. . . ." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 895.) Evidence of sexually violent behavior occurring while the offender is in custody is not required. (§ 6600, subd. (d); *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1090.)

As with any challenge to the sufficiency of the evidence, we review the entire record in the light most favorable to the verdict to determine whether substantial evidence supports the SVP finding. (*People v. Mercer* (1999) 70

12

Cal.App.4th 463, 466.) "[T]his court may not redetermine the credibility of witnesses, nor reweigh any of the evidence, and must draw all reasonable inferences, and resolve all conflicts, in favor of the judgment." (*People v. Poe* (1999) 74 Cal.App.4th 826, 830.) In particular, we do not reassess the credibility of experts or reweigh the relative strength of their conclusions. (*Ibid*.) "Reversal for insufficiency of the evidence is warranted only if it appears that "'upon no hypothesis whatever is there sufficient substantial evidence to support [the judgment].'''" (*People v. Orey* (2021) 63 Cal.App.5th 529, 561.)

"A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment." (*People* v. *Williams* (2015) 242 Cal.App.4th 861, 872.) But "'expert medical opinion evidence that is based upon a "'guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence.'''" (*People v. Redus* (2020) 54 Cal.App.5th 998, 1011.)

## II. Analysis

Appellant argues there was insufficient evidence he currently poses a risk of committing further sexually violent offenses and that the People improperly relied primarily, if not solely, on the decades-old evidence of his predicate crimes. We disagree.

All five of the experts at trial agreed that appellant suffered from ASPD and four of the five, including one defense expert, opined that appellant's ASPD predisposed him to commit sexual offenses. This was substantial evidence that the second criterion for an SVP was met.

Appellant primarily focuses his challenge on the third criterion, arguing there was insufficient evidence that he currently presents a serious and well-founded risk of committing violent sexual offenses. Appellant contends that evidence of his past sexual offenses is irrelevant to his risk of re-offense. We disagree. To the contrary, such evidence is highly probative of whether he is "likely to engage in sexually violent behavior if released." (*People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1234.) Moreover, the experts testified that they based their assessment of appellant's likelihood of recidivism not just on the crimes themselves, but the fact that appellant committed the second offense shortly after his release from prison,

demonstrating his inability to control his impulses or to learn from past conduct. The People's experts also based their risk assessments on evidence that appellant continued to have sexual desires, including his receipt of DVDs involving teen pornography and observations by staff that appellant watched pornography at the hospital. While appellant points out that this conduct did not violate hospital rules, the experts were entitled to consider it as evidence supporting a finding that appellant continued to pose a risk of sexual recidivism if released.

We also find it critical that all five experts used structured risk assessment tools, including the Static-99R, which resulted in scores placing appellant in the "above average" to "well above average" category for risk of reoffending. Appellant does not challenge any of the experts' qualifications or their use of these assessment tools. These tools have been shown to reasonably predict a person's risk of violence and are "more reliable than unstructured clinical judgment." (*People v. Jenkins* (2023) 95 Cal.App.5th 142, 158 (*Jenkins*)(conc. opn. of Buchanan, J.).) The unanimous use of these tools, accompanied by thorough expert testimony regarding how the scores informed their opinions, constitutes substantial evidence that appellant posed a substantial risk of sexual violence if released.

We also reject appellant's contention that the record contains no relevant evidence of his conduct after he was committed to the hospital in 2009. It was undisputed that appellant failed to seek treatment for his mental disorders, and even defense expert North agreed that such treatment could have reduced the risk of reoffending. It was also undisputed that appellant was unlikely to seek treatment if released and that the pressures in the community were likely to be more challenging than in the structured setting of the hospital. The People's experts also relied on their assessment of appellant's demonstrated lack of empathy and remorse, failure to learn from experience, lack of social engagement, volitional and emotional impairment, and his denial of his sexual offense history as relevant risk factors when assessing the likelihood he would reoffend. Although some evidence suggested that appellant's behavior had improved while at Coalinga, the experts cited instances where he yelled at and threatened staff and exhibited symptoms of hallucinations or delusions. Moreover, "[t]he fact

14

that defendant has not misbehaved in a strictly controlled hospital environment does not prove he no longer suffers from a mental disorder that poses a danger to others." (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 353 (*Sumahit*).) Although appellant attempts to dismiss the evidence of more recent incidents as "innocuous" or irrelevant, we do not reweigh the evidence on appeal. (*People v. Poe, supra,* 74 Cal.App.4th at p. 830.) In particular, appellant's refusal to undergo treatment was highlighted as a concern by most of the experts at trial. While alone insufficient to establish a substantial risk, it was properly considered by the experts as a factor strongly weighing in favor of their conclusion that appellant met the criteria for an SVP. (See *Sumahit, supra,* 128 Cal.App.4th at pp. 354-355 ["A patient's refusal to cooperate in any phase of treatment may . . . support a finding that he 'is not prepared to control his untreated dangerousness by voluntary means if released unconditionally to the community.'"].)

Appellant argues his case is similar to several recent cases in which appellate courts reversed Mentally Disordered Offender commitment orders[3] after concluding the dangerousness finding was based solely on violence occurring decades earlier, *People v. Johnson* (2020) 55 Cal.App.5th 96 (*Johnson*), *People v. Cheatham* (2022) 82 Cal.App.5th 782 (*Cheatham*), and *Jenkins, supra,* 95 Cal.App.5th 142. Appellant's reliance on these cases is misplaced. In *Johnson*, the appellate court found substantial evidence did not support the trial court's conclusion that the patient, who was 69 years old and diagnosed with schizophrenia that was partially in remission, represented a substantial risk of harm to others. (*Johnson, supra*, 55 Cal.App.5th at pp. 108-109.) The court found the record was devoid of evidence that the defendant's decompensation in an unsupervised setting would lead to violence. To the contrary, the evidence showed that the defendant had spent 11 years in the community under conditional release, and had stopped taking his medication for several months, with "no evidence of a single violent—or even aggressive—incident" despite an increase in his symptoms of schizophrenia. (*Ibid.*)

---

[3]     Commitment of a mentally disordered offender requires a finding the person poses "a substantial danger of physical harm to others" because of his or her mental disorder. (Pen. Code §§ 1026.5, subd. (b)(1), 2972, subd. (c).)

In *Cheatham*, the charges that led to the defendant's commitment involved an escape from criminal custody after he heard voices that led him to believe the police planned to shoot him. (*Cheatham*, *supra*, 82 Cal.App.5th at p. 786.) Cheatham was eventually placed on supervised release, but then returned to a state hospital commitment four years later, after "a number of rule violations." (*Ibid*.) He was diagnosed with schizoaffective disorder and a separate substance use disorder and began taking a medication in the hospital that largely stabilized his symptoms. (*Ibid*.) At trial, the prosecution presented testimony from two psychologists who acknowledged that they had never seen Cheatham hurt or threaten anyone. Nevertheless, they opined that he posed a substantial physical danger to others if released because he could discontinue his medications, which could lead to increased delusions and an inability to control his "dangerous behavior." (*Id*. at pp. 787-788.) On appeal, the court accepted "that a substantial risk exists that if Cheatham were released from commitment his compliance with his treatment plan would decrease and his mental health symptoms would increase." (*Id*. at p. 790.) However, the record was devoid of any evidence that Cheatham had ever engaged in behavior dangerous to others because of his mental disorder, even during the period of his release. Thus, the appellate court found that the experts' speculation that he might be unable to control such dangerous behavior in the future was not supported by substantial evidence. (*Id*. at pp. 790-791.)

In *Jenkins*, the defendant was convicted of attacking her landlord with a hammer, fracturing his skull, and imprisoning him on her apartment floor for six hours. (*Jenkins, supra*, 95 Cal.App.5th at pp. 145-146.) She was subsequently transferred from prison to a state psychiatric hospital for treatment and diagnosed with schizoaffective disorder (bipolar type). (*Id*. at p. 146.) In 2022, the court granted a petition to extend her commitment as a mentally disordered offender, finding that Jenkins represented a substantial danger of physical harm to others because of her severe mental disorder. (*Id*. at p. 149.) The appellate court reversed, finding no evidence in the record that Jenkins had ever been violent or dangerous other than her commitment offense 23 years earlier. (*Id*. at p. 153.) The court also noted that the People's experts failed to address Jenkins' age or declining health, even

16

though at the time of the hearing she was almost 70 years old, her health was "starting to go downhill," and she had recently begun using a wheelchair due to decreased mobility. (*Id*. at p. 153.) On those facts, the court found that the experts' belief that Jenkins should not be released because of her lack of insight as to her mental illness and the violence of her offense of conviction was insufficient and their opinion that she posed a continued risk of violence was conclusory speculation. (*Id*. at pp. 155-156.)

Unlike these cases, appellant was not physically limited in his ability to potentially commit further sexual offense, nor had he demonstrated that he could function on release without incident. Moreover, none of the trial courts in those cases relied upon the structured professional judgment of a qualified expert who applied a structured risk assessment instrument. (See *Jenkins*, *supra*, 95 Cal.App.5th at pp. 155–156; *Cheatham, supra*, 82 Cal.App.5th at p. 794; *Johnson, supra*, 55 Cal.App.5th at p. 109.) As such, the appellate courts' rejection of expert opinions based only on past crimes or on speculative assertions of future risk is inapplicable here.

We conclude that the evidence was sufficient to support the conclusion that appellant suffers from a diagnosable mental disorder that makes it likely he will engage in sexually violent criminal and predatory conduct if released. We therefore affirm the jury's finding that appellant met the statutory criteria of an SVP.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


CURREY, P.J.                                   MORI, J.